TRINITY–UNIVERSAL INS. CO. et al. v. MAXWELL et al.

No. 8254.

Court of Civil Appeals of Texas. Austin.

Jan. 20, 1937.

Rehearing Denied Feb. 17, 1937.

J. L. Goggans, of Dallas, and McCartney & McCartney, and Gilbert N. Harrison, all of Brownwood, for plaintiffs in error.

Wilkinson & Wilkinson, of Brownwood, for defendants in error.

BAUGH, Justice.

Appeal is by writ of error. For brevity and convenience the plaintiffs in error, who were defendants below, will be designated as appellants; and the defendants in error as appellees. The record is voluminous. The transcript contains 555 pages, and the statement of facts, in addition to original exhibits brought up with

the record, contains 992 pages. In their motion for rehearing appellants set up 460 grounds of error, 60 of which are presented as assignments on which 64 propositions are predicated, some of them containing several subdivisions. In addition to general demurrers, general denials, pleas of limitation, pleas of privilege of the several appellants, and extensive answers to the merits, appellants lodged in the trial court 232 special exceptions to the plaintiffs' amended petition.

The suit was grounded upon fraud. The original suit was filed by Maxwell on October 18, 1932, against the Universal Automobile Insurance Company, a Texas corporation, for alleged fraud perpetrated upon him in the sale to him in 1927 of stock in that corporation. By third amended original petition, on which, together with supplemental petition, the case went to trial, J. H. McKee, assignee of some of said stock, joined with Maxwell as plaintiff, the Trinity-Universal Insurance Company was made defendant, under allegations that it had by consolidation with the Universal Automobile Insurance Company, succeeded to, and had taken over, all of the rights and liabilities of the original defendant; and Edward T. Harrison and Isaac Bledsoe were made defendants, individually and as trustees of the Universal Automobile Insurance Company, under allegations that they, both individually and as officers of said company, had actively participated in the fraud alleged. The plaintiff sought a rescission of the sale of the stock to him, recovery of the $10,000 paid by him therefor, less dividends received, together with 6 per cent. interest from the dates of his purchases; and in the alternative, if rescission be refused, judgment for damages. The case was tried to a jury upon 28 special issues, which were answered in favor of appellee. The trial court denied appellee a rescission, to which appellees excepted and have cross-assigned error, and rendered judgment, after overruling the pleas of privilege and special exceptions, in favor of appellees for the damages found by the jury, plus interest from the dates of the several purchases of stock; from which judgment this appeal is prosecuted.

The first contention made by appellants is that the court erred in overruling their several pleas of privilege to be sued in the counties of their respective domiciles. Since, however, it was agreed that these pleas, which were duly controverted, should be tried without prejudice along with the trial of the case on its merits; and since there is no substantial controversy that if a fraud was practiced on Maxwell it occurred in Brown county, Tex., it is manifest that if a judgment based upon fraud can be sustained in the hearing upon the merits, the pleas of privilege were properly overruled. It will consequently be unnecessary to consider separately from the trial upon the merits the respective pleas of privilege.

The next contention made by appellants is that they were entitled to an instructed verdict and judgment accordingly on their pleas of limitation. The sales involved were of 25 shares at $200 each in May, 1927; and 250 shares at $20 each made in November, 1927. The $200 shares were later converted into $10 shares and certificates issued accordingly. One-half of the purchase price represented capital stock in the corporation; and the other half was paid in as surplus for operating purposes. The fraud relied upon was alleged to have occurred in connection with these sales. Suit was not filed until October 18, 1932; and the amendment wherein Harrison and Bledsoe were made parties defendant was filed October 14, 1933. The original capital stock of the corporation was $200,000. This was increased in September, 1926, to $300,000; in March, 1927, to $400,000; and again in November, 1927, to $700,000. The latter amount was reduced on December 8, 1928, to $500,000 and the $200,000 capital passed to surplus. The minutes of these stockholders' meetings at which such action was shown to have been taken show that most of the stock was voted by Edward T. Harrison under proxies held by him. Maxwell never attended any of said meetings, but was represented thereat under proxies executed by him.

The jury found, in response to special issues submitted to them, the material elements constituting fraud by which Maxwell was misled in making his purchases of stock. The statement of facts is voluminous, and even a summary of the evidence on the issues submitted is obviously impractical. Discarding the testimony of appellants and considering only that in favor of appellee as supporting the findings of the jury, suffice it to say that it was amply sufficient to sustain their findings of fraud. We do not understand appellants to seriously controvert that

question. Appellants, however, do seriously contend on the issue of limitation, that Maxwell came into possession of facts more than two years prior to the filing of his suit in October, 1932, which disclosed to him the falsity of the statements and representations which he asserted he had relied upon; or which, had he exercised reasonable prudence and pursued the information he had, would have disclosed to him such falsity, and that consequently his cause of action was barred by limitation when his suit was filed.

This contention is predicated in the main upon constructive notice chargeable to him through what transpired at stockholders' meetings and directors' meetings at Dallas, the minutes of which were read at stockholders' meetings in 1928 and 1929, at which Maxwell was represented by proxies appointed by him.

■ While several misrepresentations constituting fraud were alleged to have been made to Dr. Maxwell to induce him and others to purchase stock in the corporation, all of them except those relating to the corporation's statement of December 31, 1926, and the president's report of November 3, 1927, appear to have been abandoned. The statement of December 31, 1926, issued after the corporation had been operating only about seven months, showed as "operating profit, written paid basis, $111,636.56"; and the president's report of November 3, 1927, to the stockholders showed a "handsome written profit of $140,732.65 and that a six per cent dividend had been recommended." The jury found upon competent evidence to sustain such findings, that these terms were represented to Dr. Maxwell by the officers and agents of the corporation to mean clear and net profits made by the corporation; that Maxwell believed such representations and acted upon them to his injury; that they were false; and that same were issued by the corporation for the purpose of misleading the public as to the financial condition of the corporation and to induce Maxwell and others to purchase stock in the corporation. Six per cent. dividends were paid for 1928 and 1929. It does not appear to be controverted, however, that the corporation had never made any net profits. While the statement of December 31, 1926, does show that $195,-000 surplus had been paid in to the corporation, and listed a then existing surplus of only $102,989.60, we find nothing in this

that would indicate that the representations made were false, or to put a layman upon inquiry as to the truthfulness of as to the actual prosperous condition of the corporation. There is nothing to indicate that such surplus was not sufficient for the needs of the corporation at that time, and the same statement shows assets of more than $400,000 in stock and bonds, and cash of nearly $100,000. Obviously the difference between the surplus paid in and that shown on hand could readily have been accounted for in one or both of these items listed as assets.

■ While all of the appellants present a common appeal, it is urged that appellant Bledsoe was never in Brown county and that it was not shown that he ever talked to Maxwell, or that he participated in the alleged fraud in any manner. However, Harrison and Bledsoe were trustees of said corporation in effecting its organization, operation, and the sale of its stock, and were given a wide discretion in the latter capacity. The jury found that Arch King, a local agent at Brownwood, who first contacted Maxwell, was the authorized representative of both. The reports above referred to, used as a basis for stock sales, were obviously issued with the full knowledge and consent of Bledsoe, joint trustee with Harrison. The notes executed by Maxwell as part payment for the stock contracted for, were payable to Harrison and Bledsoe as trustees, and were by them collected in November, 1928. Not only do we think it is clear that Bledsoe was a party to the misleading and deceptive reports issued by the corporation and by his co-trustee, Harrison, and jointly responsible therefor; but as a joint trustee, having collected the notes procured through such fraudulent methods, and having secured and retained the benefits of such moneys so collected, he cannot be heard to deny liability for that which his cotrustee, and the corporation of which he was likewise trustee, had, with at least constructive notice to him, deliberately brought about. Delaware Punch Co. v. Reinarz (Tex.Civ. App.) 61 S.W.(2d) 135 (writ ref.); King v. Cliett (Tex.Civ.App.) 31 S.W.(2d) 350 (writ ref.); 20 Tex.Jur. 97, § 62; Taylor v. Commercial Bank, 174 N.Y. 181, 66 N.E. 726, 62 L.R.A. 783, 95 Am.St.Rep. 564.

■ On the issue of limitation the rule announced by the Supreme Court in Glenn v. Steele, 61 S.W.(2d) 810, is that "fraud will prevent the running of the

statute of limitations until discovered, or by reasonable diligence might have been discovered. Knowledge of facts that would cause a reasonably prudent person to make inquiry which would lead to a discovery of the fraud is in law a knowledge of the fraud." See, also, 20 Tex.Jur. 112, § 75 and authorities there cited. While appellee pleaded various facts which he alleged were concealed from or misrepresented to him as to the affairs of the corporation, the only ones submitted to the jury related to the misleading reports of the corporation issued in 1927 and the representations made to him with reference thereto. Other than what these reports themselves disclosed and the information sent to Maxwell in notices of stockholders' meetings for designated purposes, the only information which would put Maxwell upon inquiry was that acquired by proxies appointed by him who attended such meetings. This information consisted of minutes of the various meetings of the directors prior to such stockholders' meetings, discussion of the affairs of the corporation and action taken by the stockholders at such meetings. Appellants insist that Maxwell was charged with information acquired by his proxies, and that such information was sufficient to put him upon inquiry as to the truth of the facts alleged by him, which, if pursued, would have disclosed the alleged fraud more than two years prior to the filing of his suit.

The general rule announced in 14 C.J., p. 911, § 1412, is that in such cases a stockholder is charged with notice of all matters disclosed at such meeting of his proxy. The jury found in answer to special issues submitted to them that Maxwell received no such information prior to October 16, 1930 (two years before this suit was filed), as would put a reasonably prudent person upon inquiry as to the truth or falsity of the matters alleged to have been fraudulently misrepresented to him; and, likewise, that his proxies did not receive any such information prior to that time. Appellants insist, however, that the reduction of the capital stock in January, 1928, from $700,000 to $500,000 in order to increase the amount of surplus available, the approval of a settlement agreement with Jarratt and Belknap made in 1928, whereby they were paid $50,000 in money and $50,000 in stock to release their agency contract with said corporation, and the payment of only a 6 per cent. dividend in 1928, were all matters which should have caused a prudent man to make inquiry into the exact condition of the corporation, which inquiry would have disclosed the true facts more than two years before appellee's suit was filed.

With these contentions we do not agree. The minutes of the corporation were for the most part but a summarized record of the conduct of the corporation's business. The reduction of the capital stock could readily have been accounted for on several grounds, as, for instance, reduction of franchise taxes, corporate taxes, to provide a larger surplus for the protection of policyholders, etc., and not as any indication that the reports of the corporation's business in 1927 were false or untrue. So far as the settlement of the contract with Jarratt and Belknap was concerned, the facts appear to have been that said corporation took over the business of Universal Lloyds, a San Antonio company, of which these two men were general agents. The corporation had then made a contract with them as general supervising, soliciting agents, covering a period of 20 years in which they were to be paid a 5 per cent. commission on all business written during that period, or until $200,000 in commissions had been paid. There was no evidence that this contract would have caused the corporation any loss of money had it been carried out. The fact that the board of directors of the corporation subsequently decided that the business could be secured at less expense by canceling such contract and thus saving to the corporation this obligated sum was, we think, a matter going to a prudent and economic conduct of the affairs of the corporation in the future, in the light of the large and growing volume of business which Harrison and others represented to the stockholders was coming to it, rather than as an indication that the company was in financial straits and that their glowing reports of a prosperous condition were false. And the declaration of a less dividend at the end of 17 months business than its statements showed had been earned rather comports with good management and a sound financial status, than as indicating the contrary. Nor was the fact that subsequent to 1929 dividends ceased and surpluses were reduced, even if such reduction were known to Maxwell, such a condition as in itself would be calculated to arouse suspicion or inquiry on the part of Maxwell. What occurred to the economic structure of the country and to all its busi-

ness enterprises between what is commonly known as the stock market crash in 1929, and the early part of 1933, are now matters of common knowledge; and during that period growing financial stress of said corporation was not calculated to arouse suspicion in the minds of stockholders that the representations as to the corporation's affairs in 1927, when Maxwell bought his stock, were false.

 Not only is this true, but what amounts to prudence in prosecuting an inquiry by a stockholder must be determined by the facts and circumstances surrounding his case, and by the relationship of the parties involved. In the instant case, at the stockholders' meeting of November 20, 1928, which is the one upon which much stress is laid by appellants, the record shows that of the 19,026 shares represented, Harrison, who was then president of the corporation and actively in charge of its affairs, represented either as owner or by proxy, 17,176 of such shares. The stockholders were scattered throughout the state and it is apparent that the affairs of the corporation were largely under his control. And it is settled law in this state that the officers and directors of a corporation occupy a fiduciary relationship to its stockholders and act in the capacity of trustees for them. 10 Tex.Jur., 681, § 70, and numerous cases cited under note 6; also 11 Tex. Jur., 21, § 372. This relationship existed as between Maxwell on the one hand and Harrison and Bledsoe on the other after the issuance to him in the fall of 1928 of the stock purchased, and so prevailed at the times of the stockholders' meetings involved. It is also true that failure to make inquiry which would reveal the existence of a fraud and so start the statutes of limitation to run against a defrauded party, may be excused when the relationship of trust and confidence exists between the parties. 20 Tex.Jur., 114, § 76. This is also true where the conduct or continued representations of the guilty party are such as to lull the injured party into a sense of security or to conceal any suspicious circumstances. In the instant case we think the reports of the corporation and the assurances of Harrison to the stockholders of the remarkable record of the corporation and its flourishing condition, coupled with the payment of dividends so soon after it began operation, were calculated to, and did, lead Maxwell to believe that what had been told him was true, and afford a reasonable excuse in not sooner making an investigation into the real condition of the corporation's affairs. This is true independent of, and without regard to, the rule laid down, and urged by appellees here, in the decisions of the Supreme Court as far back as Labbe v. Corbett, 69 Tex. 503, 509, 6 S.W. 808, that one who is guilty of an affirmative fraudulent misrepresentation of a fact cannot urge that the defrauded party could have discovered the truth had he diligently made investigation. This rule has been followed by the court in subsequent cases (see Buchanan v. Burnett, 102 Tex. 492, 495, 119 S.W. 1141, 132 Am.St.Rep. 900) and would appear to be applicable here. Whether so or not, however, we think the relationships existing and the facts and circumstances above stated were sufficient to excuse the failure of Maxwell sooner to investigate and discover the true facts upon which his suit was predicated.

 Appellants also present numerous objections and exceptions made to the several special issues submitted to the jury many of which are in fact predicated on the contentions hereinabove discussed and we shall not unduly prolong this opinion by setting them out here. It is urged that the trial court should have defined the terms "clear or net profits," "actual or net profits," and "material inducement," as used in the special issues submitted. Had the jury been called upon to determine whether the corporation had made actual, clear, or net profits in 1926 or 1927, or, if so, what such profits were, we think appellants would be correct. But no such issues were submitted to them. The only issues submitted on the question of misrepresentation were whether the officers and agents of the corporation had in the sale of the stock to Maxwell represented to him that the language used in the corporation's and the president's reports, that is, "operating profit, written paid basis," meant actual or net profit of the corporation. All the jury were required to do was to find whether such representations were made. It was not necessary, therefore, that the term "net profits" be defined.

 The same contention is made with reference to the term "material inducement" as used in the issue inquiring as to whether Maxwell was led to make the purchase because of the representations made. This was not, we think, such a distinct legal term as is contemplated in the

provisions of article 2189, R.S., requiring definition or explanation. The words have a common and accepted use and meaning, and the jury probably understood their significance as well as it would have understood any attempted explanation of them.

Several objections are made as to issues submitted, the answers returned, and the arguments of counsel made on the questions relating to the amount of the damages sustained. Appellee sought primarily a rescission of his purchase of the stock and the return of the moneys paid therefor, less the dividends received. Motion for judgment of rescission was made but denied, and only damages allowed by the trial court. Appellee has cross-assigned error in this regard. We have concluded that under the findings of the jury on the issues of fraud, and that Maxwell did not either personally or through his proxies acquire such information as to prompt an earlier inquiry into the affairs of the corporation which would disclose to him the truth or falsity of the misrepresentations alleged, his delay was excusable, and that he was entitled to his remedy of rescission. It is now well settled that where a contract is induced by fraud, and the person defrauded acts seasonably after discovery of the fraud, he may either affirm the contract and recover the resulting damages; or he may disaffirm, have his contract rescinded and recover what he has paid, unless special circumstances render it inequitable for him to do so, intervening rights have arisen, or it is impossible to restore the status quo. 7 Tex.Jur., p. 912, § 20; 20 Tex.Jur., p. 115, § 77 et seq. Nor was appellee necessarily required to make election in advance as to which remedy he would follow where it could not be determined until a full hearing was had which remedy he would be entitled to. He could properly sue in the alternative, as was done here. Wood v. Williams (Tex. Civ.App.) 46 S.W.(2d) 332; 20 Tex.Jur., p. 121, § 82.

Several complaints also are made of arguments of different counsel for appellees before the jury. Most of them appear to have been either facetious, legitimate comments on the evidence, or invited. However, we deem some which we shall discuss as improper and calculated to create prejudice in the minds of the jurors against one of the defendants, Edward T. Harrison, in particular, in view of the fact that the case was bitterly contested and the testimony as to the vital issues in the case, as between him and Dr. Maxwell, was sharply conflicting. That is the testimony as to the representations which Harrison made to Maxwell as to what was meant by "operating profit, written paid basis."

In the concluding argument of counsel for plaintiff, the following language was used: "What do dividends mean? The law has always been, as it is repeated in our statutes many times, and in our criminal statutes. It is a crime to pay dividends except from net profits under our laws—a crime subjecting you to ten years' imprisonment."

This argument was objected to at the time as not warranted by the evidence, as giving additional instructions to those given by the court, as an argument of law, rather than of fact, as prejudicial and inflammatory, and as telling the jury that the corporation of which Harrison was president, had committed a criminal offense in paying the dividends paid. The objections were by the court overruled. The objections were, we think, well taken, and the jury should have been properly instructed with reference to this argument. The refusal of the court to do so probably added force to the impression left in the minds of the jurors. Missouri-Kansas-Texas R. Co. v. Thomason (Tex.Civ.App.) 3 S.W.(2d) 106. No issue as to the legality of the dividends declared had been submitted to the jury. As above stated, Harrison, as president, appears to have been largely in control of the business of the corporation, and the case was tried largely on the theory that he was chiefly responsible for the condition of its affairs. The vice of the argument was in effect to brand him as a criminal, unworthy of belief, and to prejudice his defense and his testimony in the minds of the jury.

The following also occurred in the closing argument, of which complaint is made:

" 'My time is about up. I urge upon you in this case not to lay down on your job as the saying is. That is not too much to ask in this. This is a big case. There is a great deal besides money in this case. These men's comparative reputations are at stake in this case.'

"Whereupon, Mr. C. L. McCartney, Sr., of counsel for defendants, objected to such

argument because it was highly prejudicial, inflammatory and improper in beseeching the jury to answer the issues purported on bases other than those contained in the charge of the court, and on bases other than the evidence and testimony introduced during the trial of such case. Whereupon, the court instructed the jury as follows:

" 'Gentlemen of the jury, you will not consider those things, and confine yourselves to the issues.'

"Despite such instruction of the court, plaintiffs' said attorney continued such argument by stating, immediately thereafter:

" 'These men's honors are at stake in this case.'

"Said attorney referring, at such time, to the plaintiff, E. L. Maxwell, and to the president of the defendant insurance company, Mr. Edward T. Harrison. Whereupon, Mr. C. L. McCartney, Sr., of counsel for defendants, made the further objection as follows:

" 'We object to that as a direct appeal to the jury to forget the facts and to decide the issues in order to protect somebody.' "

 The second objection made, after the instructions of the court, that, "these men's honors are at stake in this case," was overruled. Appellants contend that, in view of the repetition of the argument, which repetition the court refused to condemn, left such an impression on the minds of the jurors that the first instruction of the court did not and could not remove. That the argument was improper and prejudicial, since the case was submitted on special issues, cannot, we think, be doubted. In his effort to excuse his delay in not seeking rescission sooner, Maxwell set up the facts that Harrison and the offices of the corporation were located in a distant county, and that the relationship between him and Harrison was one of trust and confidence. Other arguments of appellee's counsel were on the basis that this was a fraud case, and the testimony of Harrison and Maxwell as to the misrepresentations alleged was sharply conflicting. The result, therefore, was to array before a jury of Brown county citizens, the reputation and honor of a fellow citizen of the county, Maxwell, against that of a nonresident, and an appeal to the jury to consider these matters in their findings on the issues presented. And it may be seriously doubted, in view of the repeated argument, whether the court's instruction as to it when first made was sufficient to remove its effects from the minds of the jurors. The same is true of the argument with reference to this being a fraud case, and calling upon the jury to rebuke it. Whether a fraud as such had been committed upon Maxwell, the jury was not called upon to determine. Their consideration was confined to a finding of the specific facts inquired about from the evidence submitted. Whether those facts as found constituted a fraud upon Maxwell was no concern of theirs.

 Improper arguments of counsel as constituting error have been frequently before the courts in recent years. Such arguments have become more significant when made in cases submitted on special issues for the reason that such submissions are designed to elicit impartial fact findings on issues made before the jury, without regard to whether the jury believe that one party or the other may be entitled to a judgment. Wootton v. Jones (Tex.Civ. App.) 286 S.W. 680, 688. It becomes all the more important, therefore, that these findings be made strictly from the evidence adduced, untrammeled and uninfluenced by any bias in favor of or prejudice against any of the parties to the litigation. Any argument, therefore, which is reasonably calculated to arouse such feelings in the minds of the jurors tends to defeat the purposes sought to be accomplished by the special issue statute. Consequently the trend of the decisions is to require counsel, at the risk of reversal, to confine their arguments more strictly to fact questions presented; and the rule adopted by the Supreme Court as announced in Humphreys v. Roberson, 125 Tex. 558, 83 S.W.(2d) 311, 313, is: "The rule enforced by this court in case of improper argument to the jury is that it must clearly appear that no injury could have resulted from the argument, or the cause will be reversed." See, also, 41 Tex.Jur., p. 816, § 85, and numerous recent cases cited under note 6. And in such case, where improper argument is made, prejudice will be presumed. This rule is particularly applicable where there is sharp conflict in the evidence, and where, as is contended by appellants here, some of the findings of the jury are seriously questioned as being without support in the evidence.

We are inclined to the view that errors were committed in some respects with regard to the issues of the amount of the damages, but in view of the conclusion that appellees were not barred from their right to rescission, which they sought primarily, we deem it unnecessary to further prolong this opinion by a discussion of the questions presented in that regard. Nor are we authorized, in view of the record presented, to render such judgment in behalf of appellees.

For the reasons indicated, the judgment of the trial court is reversed, and the cause remanded for another trial.