## BLAINE v. LOWERY et ux.
### No. 13105.

Court of Civil Appeals of Texas. Dallas.
Dec. 5, 1941.

John W. Pope, Sr., of Dallas, for appellant.

Robert B. Hershey, of Dallas, for appellees.

BOND, Chief Justice.

Carl W. Lowery and wife brought this suit against M. H. Blaine, E. F. Patterson and Robert A. Blaine, Jr., for damages based on actionable fraud in regard to a transaction in stock in a corporation.

The Lowerys were the owners of a drug store located at Waxahachie, Texas, of the reasonable market value of $2,300. They inserted an advertisement for sale in a Dallas newspaper, causing M. H. Blaine to become interested, apparently to purchase the business, which finally resulted in a transfer of their stock of merchandise for forty shares of stock in a corporation represented by the defendants to be of a reasonable market value of $50 per share.

The cause was tried to a jury; M. H. Blaine and E. F. Patterson were found to have made the representation, in substance, that the stock involved in the transaction was worth $50 per share; that such representation was a material inducement to plaintiffs to purchase said stock; that the stock was worthless at the time of its delivery "in the condition and under the circumstances then existing"; that such representation by said defendants was purposely made, with knowledge that same was untrue, and that plaintiffs should be awarded damages, actual and exemplary, in the sum of $4,000. Accordingly, the trial court entered judgment in favor of the plaintiffs against M. H. Blaine and E. F. Patterson, jointly and severally, and in favor of Robert A. Blaine, Jr. M. H. Blaine alone has presented this appeal.

Appellant seeks reversal on only two assigned propositions of law: First, where a prospective purchaser makes for himself an investigation of properties offered to him either for purchase or exchange, he cannot be heard to say that he relied upon representations as to value, or otherwise, in the absence of positive proof that he was hindered in making such investigation; and, second, where there is competent and probative evidence showing that the property purchased has a value, a finding by a jury that the property is worthless will be set aside on the ground of insufficiency of evidence to support the verdict. In the light of the two propositions urged, actionable fraud in the transaction must be conceded; appellant seeks to avoid its damaging consequences by lack of diligence on the part of the purchasers to discover the fraud by timely investigation of facts that would have led to a full disclosure; and for lack of sufficient evidence to support the jury's verdict that the stock purchased in the corporation was worthless. We think the jury's verdict has ample support in evidence and that the trial court properly rendered judgment against the offending parties.

Mrs. Lowery testified, and her testimony is fully corroborated by that of her husband, that three or four days after the advertisement appeared in the newspaper, M. H. Blaine came to Waxahachie to interview her and her husband relative to the sale of the advertised drug store and, while there, made an appointment for them to come to Dallas and meet him at Dallas Thrifty Drug Store, on Bishop and Seventh Streets, to talk over the matter. She testified that on arrival at Dallas, they went to the drug store and while there, M. H. Blaine advised them he would like to go in the drug business at Waxahachie,—seemingly very interested in buying the stock. After talking awhile, Blaine took them for a ride over the City of Dallas; told them he owned 22 drug stores in Dallas, pointing out various drug stores, buildings, and manufacturing plants which he claimed to own; said he intended to have a chain of 50 stores within a very short while. He impressed them as being quite wealthy, with an unlimited amount of money and credit. On that occasion, Mr. Blaine arranged another meeting for the next morning, saying "he would like to come down to Waxahachie and bring his appraiser to look over our stock and to tell him what it was worth." The following morning, Blaine and Patterson came to Waxahachie; Blaine introduced Patterson as his appraiser, saying "This is the man I have hired to do this, because I don't know how to appraise stock; that's what I hired him for." Patterson looked over the store and while he was doing so, Blaine asked "how would we like to join a big corporation and have a drug store in Dallas to run as our own, it would be like our own, only we would be in with a corporation where we would make a lot more money than running it individually; that he had a great big corporation in Dallas, and rather than buy us out in Waxahachie, we would join the chain and take stock in the corporation; my husband would be manager of the store, and I would be cashier; in other words, the store would be just like ours, only we would have a chance to make much more money." Blaine represented to them, so Mr. and Mrs. Lowery testified, that the corporation, Dallas Thrifty Drug Stores, Inc., was incorporated for $40,000; that he was the owner and controlling head of the business and had $5,000 in cash to carry on the business; that the stock in the corporation was actually worth $50 per share. Mrs. Lowery testified that, in discussing the holdings, Mr. Blaine said that "the drug manufacturing plant was a big thing, and that all the stores he owned were doing a good business; money was no object to him; that he was putting in more stores right along and needed managers." After looking over the drug store at Waxahachie, Patterson advised Blaine that the stock was worth $2,300. Thereupon, Blaine offered $2,000 for the stock of merchandise, payable with stock in the corporation, or 40 shares represented to be worth $50 a share; that he

would refinance a $500 note due by the Lowerys to the Cisco Bank, and that he would give them places to work in the corporation. On such representations and inducements, Mrs. Lowery testified they closed the deal, executed a bill of sale for the Waxahachie drug store to the Dallas Thrifty Drug Stores, Inc., and received in consideration therefor the 40 shares of stock in the corporation. She said: "At that time we believed he was in a position to fulfill that promise. We thought he was the head of the Corporation, owned all the drug stores that he said he owned and pointed out to us. We were impressed with his worth just as he said; he was dressed nicely, drove a nice car, and seemed to own all these drug stores and all the property he pointed out to us. We had no reason to doubt the truthfulness of his statements."

The evidence further shows that on the first visit to Dallas, Mr. and Mrs. Lowery looked over the Corporation's drug store at Seventh and Bishop Streets, and on the second occasion, in company with Patterson, they visited the drug store on East Grand Avenue, in Dallas. They testified that on neither occasion were they interested in the stores or the value of the stocks. They were interested only in selling their drug store at Waxahachie. They were asked: "Q. What were the stock certificates worth? A. They were actually worth nothing at all; the first day after we went to work in there, we learned that. They weren't worth any money, none of the whole crowd, or the drug stores, weren't worth any money." And then, on cross-examination, Mrs. Lowery was asked:

"And you had gone into these stores and made some investigation, didn't you? A. Yes, sir.

"Q. The best you could, as you could see—. A. I looked the stores over. * * *

"Q. On your two visits up here (Dallas) before you finally entered into these contracts and visiting the Company, the drug store on Bishop and Seventh, which you say was the headquarters then, * * * did you make any request of inquiry of the concern to let you see their books? A. No. sir, I didn't; I take people at their word.

"Q. You do that? A. I just took them at their word, that what they said was true.

"Q. You never asked to see the books of the Corporation? A. No, sir.

"Q. Did you ask them to let you see their charter and corporate papers? A. They showed us those, yes.

"Q. You saw those? A. Yes.

"Q. Who showed you those? A. Mr. Patterson.

"Q. Now, when, which trip? A. It was the trip that Mr. Patterson and Mr. Mose Blaine made down to Waxahachie, when Mr. Mose Blaine brought him down and introduced him as an appraiser; he, at that time, brought a little pamphlet showing the assets of the company."

■ The undisputed evidence shows that M. H. Blaine owned no stock in the corporation, and that he was not connected in any way with its corporate affairs; that the corporation owned no buildings and possessed only the stock of merchandise in two small drug stores. The evidence further shows that the corporation was delinquent in the payment of its current bills, house rents and merchandise accounts; it had no commercial rating whatsoever, no bank accounts, credits or other means to purchase replacements; it had not sufficient business or income to pay the salary of its employees. Mr. and Mrs. Lowery, after qualifying that they were capable of saying and passing upon whether a stock of drugs is worthless or not, each testified that the corporation was not a going concern and its stock was worthless. The record shows that soon after the Lowerys purchased the stock, a receiver was appointed for the Corporation by a district court of Dallas County, and its officers enjoined from dissipation of its assets, and finally, within a very short time after the transaction in which the Lowerys received nothing, the Corporation was liquidated. We think the record indisputably shows that the 800 capital shares of the Corporation were not worth $50 each, therefore, the jury was justified in finding that the 40 shares issued to appellees, "in the condition and under the circumstances then existing," were worthless.

Art. 4004, Vernon's Ann.Civ.St., reads in part as follows: "Actionable fraud in this State with regard to transactions in real estate or in stock in corporations or joint stock companies shall consist of either a false representation of a past or existing material fact, or false promise to do some act in the future which is made as a material inducement to another party to enter into a contract and but for which promise said party would not have entered into said contract. * * * All persons making the false representations or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in ac-

tual damages, and in addition thereto, all persons wilfully making such false representations or promises or knowingly taking the advantage of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered."

To constitute actionable fraud as defined in the foregoing statute, it must appear that a material representation was made and that it was false; that when the party made it, he knew it was false, or made it recklessly without any knowledge of its truth, and as a positive fact; that he made it with an intention that it should be acted upon by the other party, and that the party acted in reliance upon it, to his injury and damage. Misrepresentation of value of stock in a corporation is actionable fraud where the deceived party acted in ignorance of the true facts, and the lack of diligence on the part of the deceived party is no waiver of the fraud practiced upon him and on which he was induced to act. It can safely be said, we think, that one guilty of an affirmative fraudulent misrepresentation of a material fact cannot urge that the defrauded party could have discovered the truth had he diligently made investigation. Spencer v. Womack, Tex.Civ. App., 274 S.W. 175; Stroud v. Pechacek, Tex.Civ.App., 120 S.W.2d 626. Trinity-Universal Ins. Co. v. Maxwell, Tex.Civ. App., 101 S.W.2d 606. So, in the instant case, in the absence of knowledge to the contrary, appellees were entitled to rely and act upon the statements made to them by M. H. Blaine, and those of Patterson, whose action was equally as vulnerable in the transaction as was Blaine's. Patterson having failed to appeal from the judgment against him, we deem it unnecessary to relate his deceitful acts to defraud—they were of a character to induce his innocent victims to rely upon his statements, believing them to be true. Patterson was President of the Corporation and should have divulged its true status.

A defendant will not be heard to assert that the innocent victim of his cunning took his chances without proper investigation. When once it is established that there has been any fraudulent misrepresentation by which a person has been induced to enter into a contract, it is no answer to his claim for relief to say he might have known the truth by the exercise of further proper diligence. Indeed, in Texas, the doctrine has been carried to the length of protecting innocent victims who showed childlike faith in relying on misrepresentations of those who, as has been said, led them like lambs to the slaughter.

Manifestly, the jury's verdict, having awarded punitive damages of $2,000 against appellant for wilfully making the false representations and taking advantage of the fraud practiced, shows in itself that they weighed the faith of appellees in the representations and promises of appellant and his co-conspirator, E. F. Patterson.

The judgment of the court below is affirmed.