**HUNTER v. CAMP et ux.**

No. 3003.

Court of Civil Appeals of Texas. Waco.

Feb. 21, 1952.

Rehearing Denied March 20, 1952.

Watson Arnold, Waco, for appellant.
Douglas Boyd, Waco, for appellees.

HALE, Justice.

Appellant sued appellees to rescind a sales contract, to recover $950 he had paid under the same, and to recover damages, $125 actual and $250 exemplary. The contract related to a vacant lot and a house to be constructed upon the lot. The asserted cause of action was based in part upon allegations of fraud.

The case was tried before a jury. In answer to special issues the jury found, among other things, that appellees represented to appellant that "they were selling him a lot with a house to be built upon it, and not just a vacant lot"; that such representation so made was false; that appellees knowingly and wilfully made such false representation as a material inducement with the intent and design of inducing appellant to sign the contract; and that appellant relied upon such false representation and was thereby induced to sign the contract to his injury and damage. The jury further found that $125 was the sum of money which would reasonably compensate appellant for the actual money he had lost as a result of such false representation and that $100 was the amount to which he was entitled as exemplary damages.

Notwithstanding the foregoing findings of the jury, the trial court granted the motion of appellees for judgment in their favor on the ground that there was no evidence to raise or sustain the findings of the jury with respect to the issue of fraud, and rendered judgment that appellant take nothing. Appellant says the court erred in holding there was no evidence of action-

able fraud in the case, in granting the motion of appellees for judgment non obstante veredicto based upon such holding, and in rendering judgment denying him any relief.

The law is well settled that the misrepresentation of a material fact inducing the execution of a contract, whether innocently made, or with intent to deceive, constitutes a fraud which authorizes a cancellation of the contract, where it appears that the person to whom the statement was made had a right to rely upon the same and that he did so to his injury. See 7 Tex. Jur. p. 912, Sec. 20 and numerous authorities there cited. Consequently, if there was any competent evidence in this case which, when viewed in the light most favorable to the contentions of appellant, showed or tended to show the existence of the controlling facts found by the jury on the issue of fraud, then the court erred in granting the motion of appellees for judgment non obstante veredicto and in rendering judgment denying any relief to appellant.

The undisputed evidence in the case shows that the parties signed a written contract on June 4, 1950, reading in part as follows: "Blanche Camp, joined by her husband E. C. Camp, hereinafter called Seller, acting through the undersigned and duly authorized Agent, hereby sells and agrees to convey unto James Donald Hunter and Lela Mae Hunter, hereafter called Purchaser, the following described property: Lying and situated in Lot 12 in Block D of the Blanche Camp Subdivision, Waco, Texas, the purchase price is $995, payable as follows: $995 cash (of which Purchaser has deposited with the undersigned agent as part payment, the receipt of which is hereby acknowledged by said Agent): A Brick veneer structure of approximately 1285 square feet overall, consisting of 6 rooms, with attached garage, is to be constructed at a cost to purchaser of $8505. An FHA loan, to owner occupant is to be secured for $8400.00 for a period of 25 years, with interest rate of 4¼% plus ½% monthly FHA charge. The difference of $105.00 is to be paid in cash by purchaser or owner occupant. The said executed note to be secured by Vendor's lien and Deed of Trust with power of sale and with the usual covenants as to taxes, insurance and default."

The contract further provides that seller is to furnish good and merchantable title to the property, with detailed provisions relating to the furnishing of an abstract, the time within which written objections to the title may be made by the purchaser and the curing of such objections by the seller. The contract concludes as follows: "Purchaser agrees to pay, at time mortgage notes are ready for signature and structure is completed and approved, the approximate amount of $150.00 closing costs, which covers one years prepaid insurance, FHA insurance, attorney fees, etc."

Appellant and his wife testified that they were driving through the Camp Subdivision looking at houses when Mr. Camp stopped them and engaged them in conversation. They each testified fully and in detail as to the various conversations they had with appellees prior to the time when the sales contract was signed on June 4, 1950. The testimony of each was substantially the same as that of the other. Appellant testified in effect that he told Mr. Camp in their first conversation that he and his wife were looking for a house to purchase, that they had about $1,000. which they could pay on the purchase price of a home and Mr. Camp told them he thought they could do business with him. Thereupon, Mr. Camp suggested that the Hunters look through a plan book which he exhibited to them, and select the plan they thought would suit them. On a subsequent trip to the subdivision the Hunters selected a plan from one of the books furnished by Mr. Camp and were told by him that he could get a loan of $8505 on the house they had selected. They later made another trip to the subdivision, selected Lot 12 in Block D, signed the sales contract, signed various papers which Mr. Camp prepared in connection with securing an FHA loan and a construction contract with Worth Brothers, contractors. Appellant further testified that he paid appellees $850 at the time he signed the contract and a few days later he paid them an additional sum of $100.

In reply to specific questions propounded to him as a witness, appellant gave answers as follows:

"Q. Did he (meaning Mr. Camp) say anything to you about the fact that you were purchasing a house and lot, or just a lot? A. He told me that he would build this house, that he had his own contractor out there, these same Worth Brothers. He showed me some of their work out there, which was this lieutenant's house I spoke of. He asked me how I liked the work and I told him it looked all right to me. He said he was their builder and that he would do the work.

"Q. After that, did you sign the contract? A. Yes, sir. * * *

"Q. Did you ever agree to buy just a lot from Mr. Camp? A. No, sir.

"Q. Would you have bought the lot without a house on it? A. That is the reason for this being in here, (referring to the provision in the sales contract with respect to the construction of a brick veneer house) to be sure a house would be built on the lot. I also told him I wanted this in here for that reason. I wanted to be sure I would get the house before I put out what little money I had. And he also told me 'My boy, if something happens you don't get this house built, I couldn't keep your money at all, in the first place. In the second place, I couldn't afford it in the business I'm in.'

"Q. You and Mrs. Hunter signed the contract? A. Yes sir.

"Q. And I believe Mrs. Camp signed the contract? A. Yes sir.

"Q. And it is dated June 4, 1950, is that correct? A. That's right.

"Q. After that, Mr. Hunter, what happened? After you signed the contract? Did you go home? A. I went home, yes.

"Q. Did you hear any more from the Camps? A. Well, let's see. I got a telegram from them that they expected an FHA commitment soon, I believe, and that's about all.

"Q. Then did you go back to the Camps and sign any papers? A. Yes, I did. I came back and signed some papers, but I don't know what kind. I am not familiar with the real estate business enough to know what they were. I know I trusted them enough that I signed papers without anything written on them.

"Q. Did you draw any of those papers yourself? A. No, sir.

"Q. Did you have your attorney draw any of those papers? A. No sir.

"Q. Did the Camps, as far as you know, draw all the papers themselves? A. As far as I know.

"Q. The papers you signed were put in front of you by the Camps? A. Yes sir.

"Q. And were drawn, as far as you know, by them? A. That's right.

"Q. Were you trusting the Camps to do right by you? A. That's right, yes. * *

"Q. Do you recall whether any portion of the conversation you referred to related to the character and extent of the contract, whether you were buying the house and lot, or merely the lot? A. I didn't intend to buy a lot at all. I had no use for a lot. When I signed this contract it was with the understanding that the house would be built on the lot.

"Q. Mr. Camp is the one who told you that, is that right? A. That's right.

"Q. Who was present when Mr. Camp told you about getting the loan, etc.? A. Mr. and Mrs. Camp, my wife and I.

"Q. Did you enter into this written agreement relying on Mr. Camp's oral representation that you were buying a house and lot? A. Yes sir."

The undisputed evidence further shows that immediately after the sales contract was signed, appellees began their efforts to secure commitment from the Federal Housing Administration for an FHA loan in the sum of $8400 on the lot and brick veneer structure referred to in the sales contract. Pursuant thereto they secured a written statement signed by Worth Brothers, agreeing to construct the building described in the contract for the sum of $8505, the work on such structure to be started as soon as FHA commitment and approved plans were received. On June 8, 1950, appellees executed a warranty deed whereby, for a recited consideration of $995 to them cash in hand paid by the Hunters, they conveyed

to the latter Lot 12 in Block D of the Blanche Camp Subdivision. This deed, although it was not delivered to the Hunters and although no abstract of title was ever tendered to them, was filed for record by appellees. After extensive negotiations between appellees and the FHA, the latter declined to make the loan as applied for in the sum of $8400. Appellees then notified appellant that since the loan could not be procured, the six room house could not be built and thereupon appellant demanded that appellees return to him the $950 he had paid to them under the contract.

In his pleadings and by his testimony in open court, appellant tendered to appellees a deed in due form, properly executed and acknowledged by himself and his wife, reconveying to appellees the lot in controversy, such tender being made upon condition that appellees return to appellant the amount of money which he had paid to them under the sales contract.

█ We are of the opinion that the trial court erred in holding there was no evidence in this case of such fraud as to entitle appellant to a cancellation of the sales contract, in granting the motion of appellees for judgment non obstante veredicto, and in rendering judgment denying appellant any relief. Art. 4004, Vernon's Tex. Civ.Stats.; Chicago T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 19 S.W. 472; Jesse French Piano & Organ Co. v. Costley, Tex.Civ.App., 116 S.W. 135; General Bonding & Casualty Ins. Co. v. Mount, Tex.Civ. App., 183 S.W. 783; Russell v. Industrial Transportation Co., 113 Tex. 441, 251 S.W. 1034, 258 S.W. 462, 51 A.L.R. 1; Dowlin v. Boyd, Tex.Com.App., 291 S.W. 1095; Thrower v. Brownlee, Tex.Com.App., 12 S.W.2d 184; Reed v. Hester, Tex.Com. App., 44 S.W.2d 1107; Porter v. Robinson, Tex.Civ.App., 93 S.W.2d 477; Trinity-Universal Ins. Co. v. Maxwell, Tex.Civ. App., 101 S.W.2d 606 (er.dis.); Schonrock v. Taylor, Tex.Civ.App., 212 S.W.2d 260 (er.ref.).

█ It is elemental that an ambiguous contract should be construed and applied by the courts in accordance with the true intention of the parties who signed the same. If, in preparing and signing the sales con-

tract in this case, appellees thereby intended in good faith to evidence an obligation on their part to procure for the Hunters the construction of a house on the terms set forth in the contract, then in that event when they informed appellant that they could not or would not perform the obligation thus assumed by them, appellant thereupon became entitled, at his election, to treat the contract as rescinded and to recover the amount he had paid under the same. 10 T.J. p. 468, Sec. 272 and authorities. On the other hand, if appellees did not thereby intend in good faith to evidence such an obligation on their part, then the provisions in the contract with respect to the construction of a house were meaningless and in that event we think the evidence was amply sufficient to warrant the jurors in finding, as they did, that the signing of the contract by the Hunters was induced by wilful fraud on the part of appellees. In neither of these events, however, were appellees entitled either to an instructed verdict in their favor or to judgment non obstante veredicto, because under the evidence as a whole the question of the intent of appellees was in either of these events an ultimate, issuable fact for the determination of the jury.

Although we have concluded that the judgment of the trial court must be reversed, we cannot here render judgment disposing of the case. In addition to what has already been said, the record discloses that appellees made numerous objections during the trial to the admissibility of some of the evidence offered on behalf of appellant and they also interposed many objections to the substance and form of the court's charge to the jury. It appears to us that some of these objections should have been sustained. However, appellees did not file any motion for new trial because the court sustained their motion for judgment non obstante veredicto. Had the trial court rendered judgment for appellant on the verdict of the jury for any or all of the relief sought by him, appellees would have been entitled to complain in a motion for new trial of the errors committed by the court during the trial, and if such motion had been overruled they would have been enti-

tled to have the rulings of the trial court reviewed on appeal.

Therefore, the judgment appealed from is reversed and the cause is remanded to the court below for another trial.

LESTER, C. J., took no part in the consideration or disposition of this case.