### COCKBURN v. LESS et al.
### No. 14621.

Court of Civil Appeals of Texas. Dallas.
March 20, 1953.

Rehearing Denied April 17, 1953.

J. L. Webb, Houston, and Shank, Dedman & Payne, Dallas, for appellant.

Carrington, Gowan, Johnson & Walker, Dallas, for appellees.

CRAMER, Justice.

This is a duly perfected appeal from an order overruling a plea of privilege. John R. Less and Mercantile Petroleum, Inc., filed suit against H. C. Cockburn, a resident of Harris County, alleging that the appellant had, by fraudulent representations made in Dallas County, induced Less and Mercantile Petroleum to purchase from Cockburn the gas and condensate rights under certain leases and properties in Wharton County, Texas; and sought the recovery of damages both under Art. 4004, R.C.S., and in the general sense. The plea to be sued in Harris County was seasonably filed and controverted on the ground that Cockburn had committed a fraud on the plaintiffs in Dallas County, Texas, within the meaning of exception 7, Art. 1995, R.C.S., Vernon's Ann.Civ.St. art. 1995, subd. 7. On the hearing, the plea of privilege was overruled. Appellant on this duly perfected appeal briefs three points of error.

Appellant's first two points are briefed together and they will be so considered. In substance they assert error in overruling the plea of privilege (1) since there was no competent evidence that appellees, or either of them, have been damaged by the alleged fraudulent representations, and (2) appellees have failed to establish by competent evidence a meritorious cause of action against appellant. These points are countered that the evidence sustained the court's implied finding that appellees sustained substantial damages by virtue of fraudulent representations. Appellant's counterpoint to this was that appellees had failed to establish "injury and/or damages resulting from the alleged transaction." Only two witnesses testified on the hear-

ing, from which we will quote the substance of those portions we deem material here:

John R. Less, an oil driller, producer, and purchaser and seller of leases and oil properties, testified he bought from Cockburn the gas properties located in the Pracifka Field in Wharton County, Texas, about January 1952, paying therefor, about Dec. 27 or 28, to Lee Stone, Cockburn's agent, a total of $417,500. In October 1951 he learned from Ed Aycock in Dallas the properties were for sale. Aycock gave him the production figures, the estimated reserves (from a report furnished by Cockburn), approximate production pay-out, and the asking price for the property; that there was in the vicinity of 1200 acres with five gas wells producing from three complete sands classed as "A", "B", and "C" sands in the report. Less talked with Mr. Cockburn but twice and then only casually. Cockburn told him Stone had full authority to go ahead and make any kind of deal; that Stone when he came to Dallas represented there were five producing wells which had been producing; were producing; that the approximate amount of income and revenue from them would be based on about 150 million cu. ft. of gas; that on certain months they hadn't run that amount of gas because the United Pipe line wouldn't take it; that the allowable on it, as presented to the Railroad Commission, was a little over 200 million cu. ft. a month; that neither he nor any of his representatives ran a flow test on the wells in the field, but he relied on the information given him by Cockburn and his representative, and he did not learn before the sale was completed in late December that any of the wells were not producing. Stone had said that the J. W. Pracifka gas well "needed a little cleaning out; that it had sanded up, which it did periodically, and which was a very minor factor in the deal. In fact, part of the consideration—I mean, it wasn't just an asking and paid-for price; they made certain allowances in the purchase price of the property to take care of that particular condition. Q. Was anything said about the water condition in the Wharton Bank & Trust well No. 2? A. They said it was just making a very little

water, and it would take minor remedial work to fix it and squeeze it off, and it had never been attempted before. And that was taken into consideration also." Nothing was said to him to indicate that any of the wells were not in production in November and December 1951; they said all wells were producing. They took him over the operations January 1, 1952. After the deal was closed he went down to the properties and found that only two wells were operating and that three had not been producing; also found that they had attempted major remedial work on the properties unsuccessfully; that Mr. Matthews called him to come down there immediately when he went to work for him to explain the situation. Less testified: "Q. Now, did you then promptly notify Mr. Cockburn of your findings? A. That was one of the few times —I went immediately to his office and confronted him, with Mr. Stone and Mr. Cockburn's superintendent, confronted him with this information that the wells were not producing and that they had attempted this major remedial work; and they said they hadn't attempted any major remedial work, and that was all there was to it." He testified further that the average monthly production after January up to the most recent month was in the vicinity of 100 million a month and that they had to cut that down because two wells wouldn't produce it—that it was an excessive rate; that in deciding what he was willing to pay for the properties, he did so on the basis of five wells, with a 150 million cu. ft. monthly production average plus the reserves under the five wells in the three sands (A, B, and C). With the two wells operating producing only from one sand, the other two sands were not producing, they couldn't possibly produce more; that with only one sand producing, he wouldn't have wanted to buy the properties, but if he had bought them he wouldn't have given "over possibly anywhere from thirty or forty or forty-five per cent of what the total price was."

On cross-examination he stated that Mr. Cockburn lived in Houston, Texas, and had his office there. He met him on three occasions, the first time in his office in December 1951, when he, his son, and Mr.

Stone and possibly Mr. Aycock, were present; later, the same month, in Houston, and again, after the deal was closed. He had never before been on a trade in which Aycock was involved. Aycock first talked with him in October 1951 in Dallas, over the phone; he then went to his office in the Mercantile Securities Building. Mr. Shugart, engineer, and Don—E. D. Turner—were present; Shugart and Turner were interested in the deal. They first took him to Aycock. Aycock gave Less the information as to what the production was and what the income was. He said that there were five wells involved that were producing 150 million cu. ft. a month and they were bringing in a gross income of $10,500 a month and that the deal was based on a sixty-month pay-off. He figured 150 million cu. ft. at 7¢. He submitted a report and maps showing the property. The report was an evaluation report that had been made for Mr. Cockburn. They had several meetings; Stone and Less were present at each meeting. The first meeting was the first part of December 1951; Less went to Houston and Wharton with Stone; looked over the properties. Less, Stone, Hubert Johnson and Duvall Williams, President of Mercantile Petroleum, Inc., were present at the closing. He had met Mr. Finley; Mr. Stone had introduced them the first trip he made to the property. The introduction was one meeting that had passed between them. Next time he saw Finley was in January when he went to Cockburn's office to advise him that he had found out about the remedial work he had attempted on the wells.

L. B. Matthews testified, material here, that he worked for H. C. Cockburn Oil Company prior to January 1, 1952; had gone to work for him January 15, 1950; after January 1, 1952 he worked for Mr. Less. His duties with Cockburn were running the gas system, distributing gas and looking after the gas wells, working them over, and things like that. He drilled all the wells and worked on three of them when they were worked over. The Pracifka well was worked over, it seemed to him, in July 1951—"We just washed around and cleaned the hole out and went right back

and set as before." The well had been off production approximately three months before, it did not go back on production after the cleaning job,—has not been on production since—was not on production in October 1951—and it had not been on production as of the date of the trial. The reason was that it was "Depleted, I suppose. It seems." He further testified that Wharton Bank & Trust Company well No. 2 had been off production prior to the latter part of June 1951 for a short while; "In the neighborhood of two months, maybe three months." He took part in the work-over on the wells; they "block-squeezed it, squeezed the well, cleaned it out, reshot it, and tried for production." They got no production; it has not produced at any time since June 1951. They moved from that well to the Blayvalt well and block-squeezed it; it had been off production about two or three months; they did not succeed in getting it on production as a result of this work and it hasn't been on production since. Mr. J. Finley from Cockburn's office worked with him on these re-working jobs. He thought Finley was field superintendent or district superintendent for Cockburn. He never did talk to Mr. Less about the properties prior to January 1, 1952. The approximate production since January 1952 has been 80 to 90 million from the Winn No. 1 and Wharton Bank & Trust No. 1. On cross-examination he testified in substance that he was lease man, took care of the wells, lived on the property; the work-over job he did was in June or July 1951; seemed as if it was in July.

### Opinion

The venue issues here are: Was fraud perpetrated in Dallas County, and can it be measured by a money value?

 Less, to maintain venue in Dallas County, had to prove each venue issue by a preponderance of the evidence. The first venue issue was fraud by Cockburn in Dallas County. The record unquestionably discloses that there was a misrepresentation as to the amount of production from the lease and also as to the number of actively producing sands on the lease; also evidence that such representations were

474

material, and not true. The evidence therefore was sufficient to sustain the court's finding of the fact issue of fraud against appellant.

The other material venue question was the sufficiency of the evidence to support a finding as to damages. There was evidence that the production was one-third less than was represented and that the lease was not producing from three separate sands, but was producing only from one sand; also that appellant had failed in his attempt to revitalize the other two sands, and that Less would not have purchased if he had known the true facts. This evidence made a question of fact on the issue of whether damage had been sustained by Less.

■ Appellant also asserts that the extent of the damage must be proved. We cannot agree with this contention. The court had jurisdiction over the amount involved in the pleadings. No plea in abatement asserting the amount alleged had been fraudulently alleged to confer jurisdiction on the trial court was filed. The venue fact was whether actual damage had been suffered, not the exact amount thereof.

Although there is some conflict in the authorities on this question, we adopt as our own the statement in Clark on "Venue in Civil Actions in Texas," (1953) as follows:

■■ "Sec. 3. Cases within the Exception (Fraud)—A party defrauded has alternative remedies: he may affirm the contract and recover damages which he has sustained or he may disaffirm and rescind the contract and recover the consideration. Trinity-Universal Insurance Company v. Maxwell [Tex.Civ.App.], 101 S.W.2d 606; Bell v. Twaddell [Tex.Civ.App.], 45 S.W. 2d 697; Porter v. Robinson [Tex.Civ. App.], 93 S.W.2d 477. A party affirming a contract may not rescind. Uvalde Construction Co. v. Joiner [132 Tex. 593], 126 S.W.2d 22. Since the exception uses the language 'all cases of fraud', it follows that irrespective of whether the suit is for damages for fraud or for rescission of the contract on account of fraud, the suit may be properly instituted and maintained in the

county where the fraud occurred. Instances of suits where fraud was alleged and proved are: Guerra v. Lemburg [Tex.Civ. App.], 22 S.W.2d 336 where the suit was to cancel a note procured by fraud; Woolridge v. Dibrell [Tex.Civ.App.], 36 S.W.2d 831 where the suit was to cancel oil leases procured by fraud, although the land was located in another county; Lloyds American [America] v. Friend [Tex.Civ.App.], 91 S.W.2d 766 where the suit was to cancel a stock subscription on account of fraud; Gordon v. Rhodes and Daniel [Tex.Civ. App.], 117 S.W. 1023 where the suit was to recover damages for fraud in the sale of land in Red River County, the fraud occurring in Fannin County and the court held that the suit was properly brought and could be maintained in the latter county. There are many other cases involving the sale of stock, personal property and real estate but it is not believed necessary to cite or refer to any more since the cases cited above are sufficient to demonstrate the rule involved. It has been stated that no distinction is made between actual fraud and constructive fraud and that any act which, in contemplation of law, constitutes fraud will give jurisdiction in the county where the fraud was committed and that any suit based on fraud may be brought in the county where the fraud was perpetrated. Sharp v. Meade [Mead, Tex.Civ.App.], 127 S.W.2d 510.

■ "Sec. 4. Cases Not Within the Exception (Fraud)—All of the courts that have ever passed upon the question have held that in a suit for damages for breach of contract, venue can not be sustained in the county where fraud in inducing the execution of the contract is alleged to have occurred since by suing for breach of the contract, plaintiff waives the fraud as a fact in fixing venue. Henson v. Henson [Tex.Civ.App.], 181 S.W.2d 285; Beale v. Cherryhomes [Tex.Civ.App.], 21 S.W.2d 65; Latshaw v. McLean [Tex.Civ.App.], 238 S.W. 1003; Neal v. Barbee [Tex.Civ. App.], 185 S.W. 1059; Bunger v. Campbell [Tex.Civ.App.], 183 S.W.2d 1001; Dowell v. Long [Tex.Civ.App.], 219 S.W. 560; K. P. Hopkus [Hopcus] et al d/b/a H. & J. Manufacturing Company v. Garland B.

Tredway et al [Tex.Civ.App.], 244 S.W. 2d 857. And suits for the recovery of the possession of a child have likewise been held not to come within this exception although it was alleged that the plaintiff had been deprived of possession of the child through the employment of fraudulent representations. Sheffield v. Rousey [Tex.Civ. App.], 153 S.W. 653; Slaughter v. Oakes [Tex.Civ.App.], 203 S.W. 405. A suit can not be maintained in the county where the fraud is alleged to have occurred if the fraud is only incidental to the main issue. Bateman v. McGee [Tex.Civ.App.], 50 S. W.2d 374. And in order to hold the venue in the county where the fraud is alleged to have occurred, the fraud must be the gist of the action. Slaughter v. Oakes above cited.

"Sec. 5. Proof Necessary to Sustain Venue—The authorities are not in accord on the question of the proof necessary to sustain venue in the county where the fraud is alleged to have occurred. Some of the cases hold that all that is necessary is to prove a substantial controversy on the question of alleged fraud or that a transaction which might constitute actionable fraud occurred in the county of venue and that the question of injury and extent of damages are matters to be determined upon the trial of the case on its merits. Sterling Mutual Life Insurance Company v. Larson [Tex.Civ.App.], 99 S.W.2d 1013; Benson v. Travelers Insurance Company [Tex.Civ.App.], 40 S.W.2d 996; McAllister [McAlister] v. Eclipse Oil Company [Tex.Civ.App.], 79 S.W.2d 895. In Compton v. Elliot [Elliott, 126 Tex. 232], 88 S.W. 2d 91, the Supreme Court had before it Exception 9 and referred to the exception under discussion and stated that a plaintiff who relies upon this exception fails to discharge the burden resting upon him when he does not prove an essential element of fraud, the falsity of representations alleged to have been made. Following this decision the Court of Civil Appeals of Fort Worth in the case of Eppenauer v. Schrup, 121 S.W.2d 473 held that it is necessary to prove practically all the facts and circumstances necessary to recover on the

merits which would include proof that damages occurred as a result of the fraud and in Reese v. Phillips [Tex.Civ.App.], 233 S.W.2d 588 the court reaffirms this doctrine but modified it to the extent of holding that where the evidence warranted an inference that the plaintiff sustained pecuniary damages as a result of fraud, this was sufficient. The same rule is announced in Gommillion v. Lingold [Tex. Civ.App.], 209 S.W.2d 205. In the case of Campbell v. McCowan [McCown], 176 S. W.2d 226 the Waco Court of Appeals held that upon trial of a plea of privilege in a suit for damages for fraud in inducing the purchase of land, the plaintiff was required as one of the venue facts to prove that she suffered actual damages by reason of fraud. It follows that the only safe course for a plaintiff to pursue upon the hearing of a plea of privilege involving this exception is to prove, first, the essential elements of fraud, second that the fraud occurred in the county where the suit was filed and third, that damages resulted to the plaintiff." See note 6 S.W.Law Review 258.

Points 1 and 2 are overruled.

Point 3 asserts appellees' petition in trial court, and the evidence raised issues only for breach of contract and not one on fraud, therefore not within the coverage of subdiv. 7, Art. 1995, Vernon's Ann.Civ.St., overruling of the plea of privilege was error; citing Santa Maria Water Control & Imp. Dist. No. 4 v. Towery Equipment Co., Tex.Civ.App., 241 S.W.2d 755; Western Irrigation Co. v. Reeves County Land Co., Tex.Civ.App., 231 S.W.2d 1011; Henson v. Henson, Tex.Civ.App., 181 S.W.2d 285.

Appellees counter that the pleadings and evidence show appellees' cause of action was based upon fraud which was committed by appellant in Dallas County; therefore within subd. 7, Art. 1995, V.A.C. S.; citing 20 Tex.Jur., pp. 115; 126–128; and 117; Campbell v. McCown, Tex.Civ. App., 176 S.W.2d 226; Reese v. Phillips, Tex.Civ.App., 233 S.W.2d 588. Without extending the discussion we are of the opinion that appellant had alternate remedies. He chose to base his action for dam-

476

age on fraud both under Art. 4004, V.A.C. S., and the common-law action of fraud and deceit, and not for breach of contract. The remedy under Art. 4004 is remedial and cumulative. We further hold that if appellant's contention were sustained, Art. 4004 would not accomplish the result intended by the Legislature. Point 3 is over-ruled.

Finding no error in the judgment appealed from, it is affirmed.