**H. C. COCKBURN, Appellant,**

v.

**MERCANTILE PETROLEUM, Inc., Appellee.**

No. 15142.

Court of Civil Appeals of Texas.

Dallas.

July 13, 1956.

Rehearing Denied Nov. 23, 1956.

J. L. Webb, Houston, and Shank, Dedman & Payne, Dallas, for appellant.

Carrington, Gowan, Johnson, Bromberg & Leeds; Hubert D. Johnson and John L. Hauer, Dallas, for appellee.

CRAMER, Justice.

This is an appeal from a judgment awarding appellee Mercantile Petroleum, Inc., $225,000 damages against appellant Cockburn under art. 4004, Vernon's Ann.Civ.St. The action was filed by Mercantile Petroleum, Inc., John R. Less, Empire Trust Company, and Hubert D. Johnson, Trustee, as plaintiffs, against H. C. Cockburn as defendant. Cockburn's plead of privilege was overruled, and this Court, in Cockburn

v. Less, affirmed that judgment, 257 S.W.2d 470. See also Cockburn v. Dixon, 152 Tex. 572, 261 S.W.2d 689.

On the trial on the merits, here appealed from, the jury found, on special issues, the following facts: (1–A) That on December 19, 1951 to December 28, 1951, and prior to the closing of the sale, Lee B. Stone, hereinafter called Stone, represented to John R. Less, hereinafter called Less, that the five gas wells in question were then all producing gas wells; (1–B) that at said time Less was acting as agent for Mercantile; (1–C) at the time of making said representation, it was made by Stone to Less as a material inducement to Mercantile to purchase the primary gas payment from Cockburn, which purchase Mercantile did make; (1–D) that said representation was made by Stone as a statement of fact; (1–E) was false; (1–F) Less believed said representation to be true; (1–G) Mercantile relied upon said representation in purchasing the primary gas payment; (1–H) said representation proximately caused Mercantile to pay Cockburn more money for the primary gas payment than it would otherwise have paid him; (1–I) that at the time said representation was made, Stone knew it to be false; (1–J) Stone acted within the scope of his authority as agent of Cockburn in making said representation; (1–K) at the time Cockburn knew that the five gas wells were not all producing gas wells; (1–L) that Cockburn authorized Stone to make such representation; (2) that during the entire month of December 1951, the Blauvelt well was not a producing gas well; (3) during the entire month of December 1951, the Prasifka No. 2 well was not a producing gas well; (4) during the entire month of December 1951, the Wharton Bank & Trust Company No. 2 well was a producing gas well; (6) Less, prior to the sale of the properties in question, made or caused to be made an independent investigation of the properties and of the representation of fact alleged to have been made by Cockburn; (7) Cockburn did interfere or hinder Less in making the investigation; (8) Less, prior

to the sale involved, told Stone that he, Less, knew of the condition of the properties, knew work was necessary to be done on them and that if Cockburn would reduce the asking price, he, Less, would take the properties "as is" and do the remedial work required to be done; (9) there were no facts and circumstances in the possession of Less or his agents at or prior to the sale in question, which were sufficient to put Less or his agents upon their guard or cast suspicion on the truth of the false representations; (10) Less, after he acquired the leases, did not fail to operate such leases as a reasonably prudent operator would have operated them under the same or similar circumstances; (12) that $225,000 was the reasonable market value in Wharton County, Texas, of the primary gas payment in question on the date that Mercantile paid for such gas payment; (13) assuming that from December 1951 through the end of December 1951 there were five producing gas wells on the properties offered for sale by Cockburn, and on the basis of said assumption, $400,000 would be the reasonable market value in Wharton County, Texas, of the primary gas payment purchased by Mercantile; (14) Mercantile is entitled to recover exemplary damages against Cockburn; (15) of $50,000.

On such verdict the trial court entered judgment that Mercantile recover from Cockburn $175,000 actual, and $50,000 exemplary damages, interest, etc., and taxed the costs one-half against Cockburn and one-half against Less. After his motion for new trial was overruled, Cockburn duly perfected this appeal, here briefing fifty-four points of error.

Points (1–4) and (30–31) assert in substance that the judgment of the trial court in so far as it awards Mercantile recovery of damages, should be reversed for the reason that: (1) Mercantile is bound by the independent investigation of the properties involved and of the representations of fact alleged to have been made by Cockburn in connection with said properties, which investigation the jury found was made prior to the sale; (2) Mercantile is bound by the agreement of Less to take the properties "as is"; (3) Cockburn's defenses of (a) waiver, (b) accord and satisfaction, (c) release, and (d) estoppel, and each of them, were established by undisputed evidence and by the jury's verdict; (4) trial court erred in overruling Cockburn's motion for judgment n. o. v., in that the answers of the jury to issues 7 and 9 should have been disregarded because there is no evidence to support either of such issues. The judgment, in so far as it awards Mercantile recovery of damages should be reversed for the reason that the answer (30) to issue No. 7, and (31) issue No. 9, are contrary to the great weight of the evidence and contrary to the preponderance of the evidence, and the evidence is insufficient to support said answers.

These points are countered: (1) That (a) the jury having found Cockburn successfully hindered and interfered with the attempt of Less to make an independent investigation, and such finding being supported by ample evidence, not even the promoter would be bound by his attempt, much less Mercantile, subsequently formed in 1951; and (b) no issue having been requested or submitted by Cockburn to connect the attempted investigation by Less in any way with Mercantile, any contention that the corporation is bound by its promoter's pre-incorporation actions has therefore been waived and presumed to have been found in favor of and in support of the judgment; (2) the evidence was insufficient to support the submission of an "as is" agreement; but in any event an "as is" agreement is vitiated by the jury's finding of fraud in the inducement since an "as is" agreement only eliminates by agreement any implied warranty over and above the express representations, warranties and descriptions made in connection with the sale; (3) Cockburn submitted no issue to the jury on waiver, accord and satisfaction, release, or estoppel, or any one of them; and has thereby waived each and all such alleged defenses, not one of which is conclusively established by the un-

disputed evidence, nor by the verdict which was that Cockburn intentionally misrepresented that all five wells were producing wells, and that Less believed such representation to be true. (4) There was abundant evidence to support the findings that Cockburn interfered with and hindered the attempted independent investigation by Less; that Less should not have been on his guard or suspicious of the truth of the false representation, found in issue 9, and that Less believed the false representation to be true.

The evidence here went as far, if not further, on the issue of fraud, than the evidence on the hearing of the plea of privilege, which evidence is summarized in our opinion on the venue appeal reported in 257 S.W.2d 470, and in the opinion of our Supreme Court on an application for writ of mandamus, 261 S.W.2d 689.

■ Believing the issues on fraud were supported by the evidence, and for the jury; and that the record as a whole does not justify our disregarding such jury findings, either because the evidence is not sufficient to raise the issues or that the jury findings are against the weight and preponderance of the evidence, points 1 to 4 inclusive are overruled.

■ Points 5 and 6 assert that the judgment of the trial court, in so far as it awards Mercantile recovery for damages, should be reversed for the reason that: (5) This is a suit for damages based on fraud, and there is no evidence that Mercantile sustained any damage, or suffered any injury; or, if it sustained any damage or suffered any injury, the extent thereof; (6) trial court erred in overruling Cockburn's motion for judgment notwithstanding the verdict, in that the answer to issue (1-H) should have been disregarded because there is no evidence to support it. These points are countered that the evidence sustained, and the jury found that Mercantile was injured because of the false representations of Cockburn; and that although the primary gas payment was worth only $225,000 at the time of the sale, it would have been worth the $400,000 paid for it by Mercantile if it had been as represented by Cockburn. The evidence amply supports the jury's findings.

It is Cockburn's contention, as set out in his brief, that the trial court's judgment awarding Mercantile damages should be reversed because the trial court erred in overruling his motion for judgment n. o. v., since the answer to issue (1-H) should have been disregarded because there is no evidence to support it; that it is incumbent on Mercantile to prove injury and damage "unaided by presumptions, inferences, speculations, conjectures, suspicions, or surmises," citing Wilson v. Jones, 45 S.W.2d 572, by the Commission of Appeals, holding approved by the Supreme Court in Krueger v. Krueger, Tex.Civ.App., 62 S.W.2d 684, error dismissed; appellant Cockburn asserting that "There is absolutely no evidence in this record to show that appellee has been injured or damaged by the representation found by the jury to have been made by Stone to Less that the five wells in question were, between December 19 and prior to the closing of the sale, all producing gas wells."

The representation that all five gas wells were producing wells, found by the jury to have been made by Cockburn's agent Stone to Mercantile's agent Less, to be producing gas wells from three horizons, is supported by the evidence referred to above. The damage recovery here is based on the jury's answers to issues 12 to 15 inclusive, supra. The evidence sustaining such findings was: Ed Aycock, witness for Cockburn, testified that the price at which gas was sold on the surface would establish its value when sold as reserves in the ground; and, in view of the purchase contract with United Gas Company involved in these particular properties, the recoverable reserves in this case would be in the neighborhood of 2½ to 3 cents per MFC (1,000 cubic feet).

Joseph Nalle, witness for Cockburn, testified on direct examination: "Now, Mr. Nalle, assuming that the property rights assigned by Mr. H. C. Cockburn by those four instruments, which you have just identified as having been executed by H. C. Cockburn, assume at the time, on December 29, 1951, that at the time of the delivery of these instruments and the payment of four hundred seventeen thousand five hundred ($417,500.00) dollars, assume that the following representations were made by the seller to the buyer: (a) That said H. C. Cockburn owned five producing gas wells situated on the properties offered for sale; (b) that said five gas wells all were then producing gas being sold monthly to the United Gas Company and to drilling rigs; (c) that all of said wells had been producing gas each and every month since their completion as reflected by the official reports which had been submitted and were being submitted monthly to the oil and gas division of the Texas Railroad Commission; (d) that said wells were capable of producing the allowable then permitted by the Texas Railroad Commission which exceeded a hundred and fifty billion (150,000,-000,000) cubic feet of gas per month; (e) that the five producing gas wells were producing from a total of three separate producing zones or horizons as shown by the electric logs showing results of which the wells had been completed as producing wells; (f) that one of the gas wells known as the Wharton Bank & Trust Company No. 2 was producing about thirty (30) barrels of water a day along with the gas, due to the fact that it had not been squeezed when it had been completed; (g) that the well known as the Blauvelt well had been producing about thirty (30) barrels of water a day along with the gas, due to the fact that it had not been squeezed when it had been completed; (h) that the squeezing of the two wells which were producing water along with gas, as stated above, had not been done or attempted before and would involve only minor remedial work; (i) that one of the wells known as the R. J.

Prasifka well was then producing at a reduced rate due to the fact that excess said in it needed cleaning out, which was minor remedial work, which had not been done or attempted therebefore. * * * Q State to the court and jury what, in your opinion, would be the market value of those properties with those representations on December 29, 1951? A I am of the opinion that a fair market value of the property would be in the neighborhood of four hundred and ten or four hundred and twenty thousand ($410,000.00 or $420,000.00) dollars; in view of the fact that a willing seller and a willing buyer traded at four hundred seventeen thousand five hundred ($417,500.00), I believe that would be a fair market value."

▮ Had the jury decided to take ⅗ of $400,000 (the amount found by them as the value of the property if it had five producing wells instead of three), the sum would have been $240,000. The jury was entitled to take into consideration the reduced allowable for the wells based on producing wells only. Under the record it was clearly within the province of the jury to take all the evidence in the record and thereafter find the sum of $225,000 as the value of the property at the time it was delivered to Mercantile. Points 5 and 6 are overruled.

Points 7, 8, and 9 assert that the judgment, in so far as it awards Mercantile a recovery for damages, should be reversed: (7) Since Mercantile cast its suit for damages under art. 4004, supra, and has failed to prove a cause within said Article; because (8) under art. 4004 there is no finding of the value of the primary gas payment as represented and the actual value at the time of the contract; and (9) there is no evidence of its value in the condition it was delivered. Mercantile counters that it proved a case under art. 4004, in that it was injured by false representations of Cockburn, and although the primary gas payment was worth only $225,000 at the time of the sale, it would have been worth

**324**

the $400,000 paid by Mercantile, had it been as represented by Cockburn.

Article 4004 defines actionable fraud in real estate transactions, etc., as " * * * shall consist of either a false representation of a past or existing material fact, or false promise to do some act in the future which is made as a material inducement to another party to enter into a contract and but for which promise said party would not have entered into said contract. Whenever a promise thus made has not been complied with by the party making it within a reasonable time, it shall be presumed that it was falsely and fraudulently made, and the burden shall be on the party making it to show that it was made in good faith but was prevented from complying therewith by the act of God, the public enemy or by some equitable reason * * *." The Article also provides the measure of damages as follows: "All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented or as it would have been worth had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract."

The primary gas payment was an interest in real estate and was within the coverage of art. 4004; Tennant v. Dunn, 130 Tex. 285, 110 S.W.2d 53, Com.App. opinion adopted by our Supreme Court; State v. Quintana Petroleum Co., 134 Tex. 179, 133 S.W.2d 112, 128 A.L.R. 843. We also hold that any interest in the mineral estate, or payment issuing therefrom, is land (25 Tex. Law Review 143, and cases cited in Note 21 thereunder); and that the evidence supports the amounts found by the jury.

It is immaterial that Less acted for Mercantile in the purchase. Cockburn knew the facts at the time of the closing of the transaction and knew that Less obtained a

loan from Empire Trust Company of $400,-000 and that Mercantile executed a note for that amount. The evidence shows that Empire Trust Company was looking to the properties for the payment of the debt, not to Mercantile (organized for the purpose of taking title and executing the note and loan). The Vice President of Empire testified that the Bank knew Mercantile "had virtually no assets other than the gas payments". Less testified that all Empire wanted to know was whether Mercantile was properly qualified to do business, and that Mercantile was purchasing the gas and oil payment—the collateral that Empire was loaning the money on. There was evidence that about 49% of the reserves would be used to retire the loan, which is in line with normal gas loaning procedure.

Cockburn's witness Nalle testified that the best test of market value of recoverable reserves is the price at which a willing buyer and a willing seller will trade. Mercantile's witness Davis testified that there is nothing erudite about the valuation of reasonable gas reserves and that such reserves are generally traded on a basis of about one-half of the price per MCF at the surface, " * * * in other words, about one-half of what you would get for it when you get it out and sell it." Further, that if three wells were dead, the property would be worth less than $100,000. However, the jury found only two wells were dead, and found the value to be $225,000. Such value was supported by evidence, and, in view of the record as a whole, was for the jury. Points 7, 8, and 9 are overruled.

Points 10 and 11 assert error, that in so far as the judgment awards Mercantile damages, it should be reversed because the judgment (10) permits recovery of damages in excess of appellee's loss of bargain, because loss of bargain is the limit of damages under art. 4004, supra; and (11) is excessive as a matter of law since the undisputed evidence shows that in no event could Mercantile's loss of bargain have been greater than $100,000.

What we have stated under other points is applicable here. The evidence was sufficient to support the jury's findings. Points 10 and 11 are overruled.

■ Point 12 asserts error in that so far as the judgment awards Mercantile recovery for damages, it should be reversed since issue (1–A) was not an ultimate or controlling issue. Issue (1–A) set out above in substance, in our opinion was raised by the evidence. The misrepresentation alleged by Mercantile was that there were five producing wells,—producing gas from three horizons. The jury found materially less than the above representations. Under the record here, the representations were material to Mercantile's pleaded cause of action and were ultimate, controlling issues, properly submitted to the jury. There was no error in the trial court's basing judgment for damages thereon. Point 12 is overruled.

■ Points 13 to 16 inclusive assert error in so far as the judgment awards Mercantile recovery for damages, and that same should be set aside: (13) since there is no evidence to support the jury's answer to issue (1–A); (14) since the jury's answer to (1–A) is contrary to the great weight of the evidence, contrary to the preponderance of the evidence, and insufficient to support said answer; (15) because there is no evidence to support the finding to issue (1–G) set out in substance above; and (16) such answer is contrary to the great weight and preponderance of the evidence, and the evidence is insufficient to support the answer. We have examined the record and, in our opinion, while the evidence is sharply conflicting, there is evidence to support the findings. Testimony shows the leases out of which the primary gas payment was carved were all leases which could be held in force only by production. Mercantile's attorney, before closing the deal, required and was furnished an affidavit by Cockburn's organization that each and all of the five gas wells were "now producing" gas, the affidavit also set out that they were producing gas "in paying quantities." There is also evidence to the effect, and the jury found, that two of the five wells were not producing at all. Points 13 to 16 inclusive are overruled.

■ Points 17 and 18 assert that the judgment for damages should be reversed because (17) there is no evidence to support the jury findings (8) and (1–C). Stone, agent of Cockburn in the sale, did not deny making the representations and he was the party who delivered the affidavit to Mercantile's attorney, which affidavit set out under oath that each and all five wells were producing gas in paying quantities. Points 17 and 18 are overruled.

■ Points 19, 20, and 21 assert error in awarding Mercantile damages because: There is no evidence to support the findings to issues 12 and 13, and the finding to issue 13 is contrary to the great weight of the evidence. We have held above that the primary gas payment is an interest in real estate; art. 4004; and that the rule as to damages under art. 4004 applies, and that the evidence is sufficient to sustain the findings on damages. The fact that Mercantile borrowed the money to pay for same from third parties is immaterial. Points 19, 20 and 21 are overruled.

■ Points 22 to 25 inclusive assert error in so far as the judgment awards Mercantile recovery for exemplary damages and should be reversed because: (22) There is no evidence to support the answer to issue 14; (23) said answer is contrary to the great weight of the evidence, the preponderance of the evidence, and the evidence is insufficient to support it; (24) there is no evidence to support finding 15; (25) issue 15 is contrary to the great weight and preponderance of the evidence, and the evidence is insufficient to support it. Appellee counters that there was ample evidence to support issues 14 and 15. In our examination of the record we

find no objection to the charge as to the issues in question on the grounds, or for the reasons, set out in these points. They are overruled.

Points 26 and 27 assert that the judgment of the trial court, in so far as it awards Mercantile recovery for damages, should be reversed since: (26) The trial court erred in overruling Cockburn's motion for judgment n. o. v., in that the answers to issues (1–B), (1–C), (1–F), (1–G), (1–H), and 27 are contrary to the great weight and preponderance of the evidence; countered that there is ample evidence on such issues. We must overrule these points since, in our opinion, the record shows the evidence, though conflicting, supports the answers. Such evidence is referred to in our discussion of points 1 to 4. For the reason there stated, points 26 and 27 are overruled.

Points 28 and 29 assert that the award of damages to Mercantile should be reversed because the court erred in overruling Cockburn's motion for judgment n. o. v., in that the jury's answers to issues (1–D), (1–E), (1–I), (1–J), (1–K), and (1–L), and each of them, should be disregarded, because there is: (28) No evidence to support any one of them; and (29) they are against the great preponderance of the evidence; countered that the evidence supports such issues. Under the evidence referred to under other points, we cannot sustain, and therefore must overrule, points 28 and 29.

Points 30 and 31 assert that the judgment awarding Mercantile damages should be reversed because the jury's answers to issues 7 and 9 are contrary to the great weight and preponderance of the evidence and the evidence is insufficient to support same. The evidence referred to under our discussion of points 1 to 4 supports the findings to issues 7 and 9. Points 30 and 31 are overruled.

Point 32 asserts the judgment is excessive and, as a matter of law, the evidence could sustain a judgment not in excess of $875; countered that Mercantile clearly proved its cause of action under art. 4004 and the evidence supports the findings: (1) That Mercantile was injured because of the false representations of Cockburn; and (2) although the primary gas payment was worth only $225,000 at the time of the sale, it would have been worth $400,000 if it had been as represented; therefore Mercantile's loss under art. 4004 was $175,000 and the fact that Mercantile borrowed the money to buy the gas payment is wholly irrelevant. We have already held that the gas payment was real estate within art. 4004; that Mercantile has proved injury and that Mercantile's loss of bargain was $175,000; that the fact that Mercantile borrowed the consideration it paid for the properties is immaterial here; and that the evidence supported such findings. Point 32 is overruled.

Point 33 asserts, in the alternative, that the judgment, in so far as it awards Mercantile recovery for damages, should be reversed because there was error in the overruling of his amended motion for new trial, based on a conflict in findings (1–C), (1–F), (1–G), (1–H), 9 and 14 of the answers to issues 6 and 8; countered that there is no conflict in said issues. Under the evidence in this case, the "as is" clause was based on the knowledge he had, which knowledge was based on the false representation that there were five producing wells from three horizons. An "as is" agreement is subject, in cases where there is evidence and jury findings of fraud, to rescission or damages under art. 4004, as in any other cause of action within, or covered by, the provisions of art. 4004. Here, the "as is" agreement was executed by Mercantile on the belief and reliance upon the representations found by the jury to have been false. Under such record point 33 is overruled.

Points 34 and 35 assert error in not granting Cockburn a new trial: (34) Because of prejudicial and inflammatory argument by Mercantile's trial attorneys; and (35) because the damages are excessive and manifestly the result of bias and prejudice, since the evidence is wholly insufficient to sustain the jury's answers to issues 12 to 15 inclusive; countered that the argument was not inflammatory when considered alone or in context with the balance of the argument; Cockburn made no objection to it when made; waived his objection by characterizing it as "name calling" and by telling counsel for Mercantile that if he would look into his own household he might find that there were "skeletons in your own closet." The bill of exceptions involved here was qualified as follows: "At no point during the argument did counsel for the defendant urge a single objection to any portion of the argument or request the court to give any instruction of any kind to the jury with respect to the argument or any portion of the same. The first time that an objection to the argument was made by the defendant was in his Bill of Exception No. 2 contained in his amended motion for new trial." Under such record we find no reversible error in points 34 and 35. They are overruled.

Point 36 asserts error in defining a "producing gas well" as being "a gas well which is actually producing gas or is capable of producing gas at the time in question if turned on", because it was on the weight of the evidence; countered that the definition was not on the weight of the evidence. The record shows the sworn affidavit of J. M. Fendley, Jr., delivered to Mercantile's attorney on December 20, 1951 by Stone, which states affirmatively that each and all of the five gas wells "are now producing in paying quantities." On the above and other evidence in the record, and considering the definition as given, there is no merit in Cockburn's point 36. It is overruled.

Points 37 and 38 assert error: (37) In defining "material inducement" as follows: "That the representation in question operated materially to induce the purchase of the property in question; it need not be the sole inducement leading the party to purchase such property, but it must have a material effect in inducing said party to make said purchase"; since, applied to the facts in this case, it was incorrect; (38) in submitting issue (1–C), summarized above, because there is no evidence to support it; it is on the weight of the evidence and is immaterial; countered that the definition is correct; and, if of no effect, no objection to the charge based on such reasons was made by Cockburn, and therefore waived; further, it was not preserved in the motion for new trial.

The transcript shows, in the objections to the charge the following: "To the definition of the term 'material inducement' in that as defined it is calculated to confuse the jury in that it not only asks whether the party to whom the representation was made would have entered into the contract and purchase of the properties except for the representation but it duplicates the question by further inquiring as to whether the representations were material inducement to the entering into the contract and the purchase of the properties." And in the motion for new trial and assignment, a paragraph complaining of the overruling of that definition. The definition as given is the same as that given in Broaddus v. Binkley, 54 S.W.2d 586, in which a writ of error was granted and in which the Court of Civil Appeals was reversed on this question in an opinion adopted by the Supreme Court and reported in 126 Tex. 374, 88 S.W.2d 1040, at page 1042, the court there stating: "We cannot agree that the trial court's definition of 'material inducement' as applied to the facts in this case is correct. The test of materiality necessary to be applied to the representations inquired about is whether the contract would have been signed by Binkley without such representations

having been made. It cannot be applied under the definition given."

In the motion for new trial, paragraph 5, subsection C, it is stated: "(5) The ·trial court erred in overruling the objections of said defendant to the definition set out in the court's charge * * *." Under the above record the objection to the charge and the paragraph in the charge did not cover the question here raised. We also hold that the definition is proper under the record here. Points 37 and 38 are overruled.

Points 39 and 40 assert error in: (39) overruling Cockburn's objections to the definition of proximate cause because it is outside the pleading, is a general charge, is misleading, and is on the weight of the evidence; and (40) overruling Cockburn's timely made objection to issue (1–H) because there is no evidence to support it, it is outside the pleading, on the weight of the evidence, and is an immaterial issue. The definition of proximate cause given by the court was: "By the term 'proximate cause' as the term is used in this charge is meant that cause which, in its natural and continuous sequence, unbroken by any new independent cause, produces a result, and without which cause such result would not have occurred, and which result, or some similar result, would have been reasonably foreseen by a person of ordinary care in the light of the attending circumstances." The definition was objected to as follows: "To the definition of the term 'proximate cause' for the reason that it has no place in this lawsuit as not raised by the pleadings or the evidence and is confusing and is a general charge." If proximate cause was in the case, such definition was a proper one.

By issue (1–H) the jury found the representation involved proximately caused Mercantile to pay Cockburn more money for the primary gas payment than it would otherwise have paid. Issue (1–H) contained the legal term "proximate cause,"

and defining it was proper. In Morriss-Buick Co. v. Pondrom, 131 Tex. 98, 113 S.W.2d 889, at page 890, the court said: "* * * The true measure in every case of this kind is that rule which gives to the complaining party the actual amount of his loss resulting directly and proximately from the fraud practiced upon him * * *." We are also of the opinion that there is evidence to support issue (1–H), such reasons being set out in our discussion of point 4 which refers to our opinion on the plea of privilege appealed in this cause. Points 39 and 40 are overruled.

Point 41 asserts error in the submission of issue (1–A) since it is not an ultimate issue; there is no evidence to support it; as framed, it is ambiguous and permits the jury to speculate as to dates. The evidence referred to under points 1 to 4 inclusive is again referred to here. There is no merit in point 41. It is overruled.

Point 42 asserts error in overruling Cockburn's objection to issue (1–B) because there is no evidence to support it and it is on the weight of the evidence; countered that there was ample evidence to sustain. The statement of facts shows the following evidence by Less which was admitted without objection:

"Q. ' Did you tell the officers and stockholders of that separate one-shot corporation what the deal was all about? A. Yes, sir. * * *

"Q. Who did the work on their behalf? A. Mr. Hubert Johnson and myself by doing the work, by advising them of what was going on.

"Q. Did they obtain, the officers and stockholders obtain their information from you? A. Yes, sir.

"Q. And did they put their confidence in you with respect to any decisions that would have to be made in connection with the closing of this transaction? A. Yes, sir.

"Q. And did you tell them how many producing, the officers and directors, rather, how many producing wells were to be purchased from Mr. Cockburn under the ABC transaction? A. Yes, sir, I did.

"Q. What did you tell them? A. I told them that there was going—that there were five producing gas wells, they were being purchased, that they were members of a corporate entity set up to handle the oil payment, the Empire Trust Company was loaning the money, and that I was going to operate the properties, that it would be approximately a fifty to sixty month payout under the information that had been given us, reservation production, that they would be entitled then to what is called breakage or half of one per cent between the interest rate which the oil payment was bearing and the interest rate at which they were paying for the borrowed money.

"Q. In other words, what would that little corporation have made over the life of the gas payment that it was to purchase?"

By "little corporation" the witness was referring to Mercantile. Point 42 is overruled.

Point 43 asserts error in submitting to the jury issue (1–F) because there is no evidence to sustain it, it is immaterial if believed by Less, and permitted the jury to speculate as to when Less had his belief; countered that there was ample evidence to support the issue. The evidence quoted under point 42 shows Less, acting for Mercantile, making it clear to Stone, Acting for Cockburn, and the evidence supports the agency of Less to act for Mercantile and Stone to act for Cockburn. Witness Matthews testified the representation was false; that only two of the five wells were producing gas wells in December 1951. Point 43 is overruled.

Point 44 asserts error in overruling Cockburn's objections to issue (1–G) because there is no evidence to support it; it is on the weight of the evidence, is vague and indefinite; and there is no evidence that Cockburn intended Mercantile to rely upon the representation. We have discussed the evidence material to this point in our discussion of points 5 and 6. There is no merit to point 44. It is overruled.

Point 45 asserts there is no evidence to support the finding to issue (1–I) to the effect that Stone knew the representation was false when made; countered that Stone knew the statement was false; Stone was Cockburn's agent; and Cockburn knew all five wells were not producing gas between December 19, 1951 and the closing date. The evidence set out in our former opinion on venue on the question here is substantially the same as that on this hearing, and is here adopted. Under the record, point 45 is overruled.

Point 46 asserts there is no evidence to support issue (1–L), and it is on the weight of the evidence; countered that there is ample evidence to support same. Mr. Cockburn himself testified in substance that from early August up through December 1951 he knew that Blauvelt well was "making some water" and that Fendley was trying to do something about it; Fendley told him two wells were making water; he knew some remedial work was being done on the Prasifka well. Cockburn's witness Aycock testified that both he and Less were negotiating on the basis that the wells were all producing gas wells, and as follows:

"Q. Now, another thing I want to ask you: All the way through on these properties here, you were dealing with properties that were held by producing wells, were you not? A. Correct.

"Q. If you were talking about any additional wells it was to go on—to add

to the value of your working interest over and above the gas payment and expedite the retirement of the gas payment, was it not? A. That is correct, sir.

"Q. And you know, also, being familiar with the business, that after the primary term of a lease has run out that if production ceases and there is not, under the terms of most leases, there is not re-working within sixty (60) days, continuous re-working, then releasing it automatically terminates, releasing merely clears the record title, isn't that correct? A. That is correct. When the primary term of your lease expires if there is no production on the lease, if there is not a well drilling or being re-worked, on that expiration date then that lease is of no force and effect."

He also testified that he had no new information concerning the remedial work that might be needed, other than the information he had in October 1951. Based on the above and the record as a whole, point 46 is overruled.

Points 47 to 54 inclusive assert error in overruling appellant's objection to the submission of issue (1–J): (47) Because there is no evidence to support the issue and it is on the weight of the evidence; (48) (1–K) because there is no evidence to support it, it is immaterial, not controlling, not an ultimate issue, and is on the weight of the evidence; (49) issue 12 because there is no evidence to support it, it does not conform to the evidence or the requirements of art. 4004; (50) issue 13 because there is no evidence to support it, it is on the weight of the evidence, limits the jury to the consideration of assumed facts, and does not conform to the requirements of art. 4004; (51) issue 14 because there is no evidence to support it, it is not submitted in accordance with the requirements of art. 4004, and is on the weight of the evidence; (52) issue 15 because there is no evidence to support it, not submitted in accordance with requirements of art. 4004, and is on the weight of the evidence; (53) because there are no pleadings or evidence to support it, it is on the weight of the evidence, is repetitious, overemphasizes Mercantile's theory of the case; and (54) for the same reasons as set out in point 53.

The only question as to issues (1–J) and (1–K) is whether there is evidence to support them. Cockburn testified that he did not know about the squeezing; he knew Fendley was having trouble with them; Fendley told him the two wells were making some water; he knew Fendley did some remedial work on them; also on the Prasifka well, and he was sure they had charts of the wells for 1951; and

"Q. You have never heard of just squeezing a well for sand; is that right? A. I wouldn't say that, because sometimes you squeeze two or three dozen times. You don't just squeeze it once.

"Q. In 1951 had you ever heard of just squeezing a well for sand, as distinguished from squeezing it for water? A. No, I don't know that I had.

"Q You never had heard of that at all? A. No."

Witness Hopkins, an expert, testified for Cockburn that the cost of a proper squeeze job to cut off the water at a depth of 4,000 to 5,000 feet in that area, a full operation classed as a qualified effort to squeeze off water which in that area normally comes from both above and below, together with the expense of perforating, if done without unexpected trouble, would run in the vicinity of $10,000 per well. That there are some wells in the Miocene formation that can be squeezed continuously and never shut off the water; that is, where the water has completely invaded the sands to the point where it is not possible to perforate back above the water-oil contact, "let's say for the lack of

better terminology 'Skim' off the remaining reserve oil."

On issues 12, 13 and 14 the witness R. E. Davis, a consulting geologist and engineer since 1906, testified that he remembered Jack Less calling him with reference to a reserve estimate to be made; he assigned the work to one of his geologists, Ernest Gimblett, who made the study. He was told he could get the information from the office of the sellers. Mr. Gimblett made that contact and proceeded to make the study. He did not instruct Gimblett to go to the wells and investigate the wells visually. It is normal to get reports of production from the Railroad Commission on gas properties, also data from any other source; and

"Q. Did you assume in making your estimate of reserves and conferring with Mr. Gimblett that the production information furnished by Mr. Cockburn's organization was true? A. I certainly did, sir.

"Q. Is an element in making reserve estimates—is production history an element in that estimate an important factor? A. It is certainly an important factor.

"Q. How is it with reference to other factors? Is it one of the most important or one of the least important? A. I know of no particular factor that could be more important than the study of the production.

"Q. The actual history of how much the wells have produced? A. The actual history of production—if there is a constancy of production, or their decline, or their eratic rate of production, whichever the case may be, the relation of production to pressure, if we have pressure daily, we want all of that.

"Q. What is the recovery factor used in making an estimate of reserves? A. You mean—?

"Q. What is meant by the p¹ 'recovery factor'? A. Yes.' In making an estimate as a—particularly by some methods of study, it is necessary to estimate what you believe to be the total gas in the reservoir, we call it gas in place, before gas is withdrawn. We do that in those studies where we follow what is called the volumetric method, and having come to a conclusion as to what quantity of gas we believe to be present in the reservoir we then estimate the pressure of that gas one can expect will be produced, and we are referring there to recovery of gas and the percentage of the total amount of that which we believe will be produced is called the recovery factor, expressed frequently as a percentage.

"Q. Would information concerning wells being flooded out be of importance in the recovery factor when you make an estimate? A. It would, certainly. * * *

"Q. Mr. Davis, in respect to the five wells involved in the Prasifka Field that this estimate of reserves was made: Assume that the Blauvelt well was flooded out and had been off production since early summer when you made your report; assume that the Wharton No. 2 well had been flooded out and was off production at that time, the time you made your report; assume that remedial work had been attempted on both of those wells in the nature of a squeeze job, which was unsuccessful; assume that the Prasifka well was not producing, did not have enough pressure to buck the United Gas line or the Winn line to which it was connected, would you have presented a different reserve estimate than that which you presented to Mr. Less? A. Certainly."

The above evidence and other similar evidence in the record, in our opinion,

was sufficient to support the jury's findings here under 'attack. Points 47 to 54 inclusive are overruled.

Finding no reversible error in the trial court's judgment, it is

Affirmed.