**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant,**

v.

**JEFFERSON ASSOCIATES, LTD. & F.B. Goldman, Appellees.**

No. 3–90–217–CV.

Court of Appeals of Texas, Austin.

Aug. 12, 1992.

Rehearing Overruled Oct. 14, 1992.

John Hill, Jr., Liddell, Sapp, Zivley, Hill & La Boon, Austin, for appellant.

Douglass D. Hearne, Don W. Kothmann, Hearne, Knolle, Lewallen, Livingston & Holcomb, Austin, for appellees.

Before CARROLL, C.J., and ABOUSSIE and KIDD, JJ.

KIDD, Justice.

This case arises from the sale of the Jefferson Building, a four-story commercial office building in Austin, Travis County, Texas. In late 1983, the Prudential Insurance Company of America (Prudential), after becoming, through foreclosure, the owner of the Jefferson Building, proposed to sell it to Jefferson Associates, a limited partnership, and F.B. Goldman (collectively, Goldman). Two years after the sale was consummated, Goldman discovered that the building contained asbestos. Alleging that the presence of asbestos significantly depreciated the value of the building, Goldman brought suit against Prudential. Following a jury verdict and judgment awarding Goldman actual and exemplary damages, Prudential brings this appeal. We affirm.

## THE CONTROVERSY

The Jefferson Building was constructed in 1972 and was situated in a prime neighborhood in Austin, Texas, suitable for medical office buildings. It commanded high rents and experienced favorable occupancy rates. In 1976 Prudential, having provided construction financing, acquired the building through foreclosure. In late 1983, Prudential decided to sell the Jefferson Building. Goldman successfully bid on the building. Before the purchase was completed, Goldman inspected the property himself. In May 1984, he signed a contract to purchase the Jefferson Building "as is" for $7,150,000.

In 1986, after the purchase, Goldman discovered that the building contained asbestos, which lowered the building's market value. Goldman filed suit against Prudential for misrepresentation under the Deceptive Trade Practices—Comsumer Protection Act (DTPA), Tex.Bus. & Com.Code Ann. §§ 17.41–.63 (1987 & Supp.1992), fraudulent concealment, and other grounds related to the nondisclosure of the asbestos.[1] Trial to a jury included several weeks of testimony. Upon conclusion of the evidence, the parties agreed to submit liability in the case on a general charge. Therefore, the liability issue was submitted in one question:

> Question: Do you find from a preponderance of the evidence that the plaintiffs should be entitled to recover damages from the defendant as the result of any wrongful conduct by the defendant?
>
> Answer: *We do.*

The jury also found: (1) Prudential engaged in wrongful conduct; (2) Goldman sustained actual damages in the amount of $6,023,993.03; (3) Prudential's wrongful conduct was done with conscious indifference to Goldman's rights, with gross negligence, and with actual awareness that such conduct was wrongful; and (4) Goldman was entitled to exemplary damages of $14,-300,000. The district court rendered final judgment, including prejudgment interest and attorney's fees, on the verdict.

Prudential appeals by nine points of error. In five points, Prudential attacks the legal and factual sufficiency of the evidence to support the jury's verdict. Prudential also attacks, in single points, the admission of certain evidence, the trial court's failure to grant a remittitur, and, in its final two points, the awarding of prejudgment interest and attorney's fees.

## DISCUSSION

### Liability—Wrongful Conduct

In points of error one and two, Prudential attacks the jury's liability finding that Prudential engaged in wrongful conduct. In point one, Prudential contends that there is no evidence to support the jury finding; in point two, Prudential contends that the finding is "against the great weight and preponderance of the evidence."[2] The standards of review are well settled for reviewing jury findings. In reviewing a "no evidence" challenge, we consider only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the jury's finding. The appellate court must disregard all evidence and inferences to the contrary. *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 593 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). Any probative evidence supporting the finding is sufficient to overrule the point of error. *See also* Robert Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 364 (1960).

We will sustain a challenge that the finding is factually insufficient to support the verdict only if, after reviewing the entire record, the evidence is too weak to support the finding or the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See, e.g., Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). *See* Powers and Ratliff, *supra*, at 525.

We note at the outset that the parties agreed to submit the liability portion of this case on a general charge. Thus, in reviewing the evidence, we are required to uphold the jury's liability finding if there is sufficient proof on *any* theory of recovery pleaded by Goldman.

---

**1.** In Goldman's trial pleading, he listed the following causes of action against Prudential: statutory, common-law and constructive fraud; fraudulent and negligent concealment and nondisclosure; breach of the duty of good faith and fair dealing; negligent misrepresentation; and various violations of the DTPA.

**2.** Since the plaintiff had the burden of proof in this case, this issue should be worded as an insufficiency of the evidence point of error, which is the way we shall address the point. *See* William Powers, Jr. and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 Tex.L.Rev. 515, 519 (1991).

## A. *Events Leading to the Sale of the Jefferson Building*

Goldman introduced evidence that, in the late 1970's, Prudential's corporate headquarters determined that asbestos was a dangerous material which should not be used in the fireproofing of any of Prudential's buildings. Because of this knowledge, Prudential's Director of Architecture, A.E. Zielinski, testified that Prudential would not accept plans or specifications for any of Prudential's buildings if the plans and specifications included asbestos fireproofing. By 1978, Prudential became concerned about asbestos in its existing buildings. In 1979, Mr. Arnold F. Rebholz,[3] who was in charge of the leasing and management of Prudential's real-estate portfolio at corporate headquarters, became aware of an asbestos issue involving one of Prudential's office buildings in Jacksonville, Florida. IBM, the anchor tenant, objected to the presence of asbestos in the building and eventually vacated the premises. In a confidential memo to his corporate division, Rebholz compared the economic consequences of asbestos contamination with those following the outbreak of Legionnaires' Disease in a downtown Philadelphia hotel.

In the early 1980's, Prudential began a survey of all of its properties to determine if any of the buildings had used asbestos in its fireproofing. These surveys were performed by reviewing the plans and specifications for the type of materials to be used in the structures. By 1984, Prudential had a demonstrated concern about asbestos and recognized it as an economic issue regarding both the sale of property and tenant occupancy in its buildings. Goldman contended that Prudential began selling those properties containing asbestos while continually worrying about the public relations problems associated with the existence of asbestos in its commercial-building portfolio. In one instance in the spring of 1984, Prudential attempted to sell the Gibraltar Building to the Newark Board of Education. One of Prudential's employees made full disclosure of the asbestos building materials used in the Gibraltar Building and the Newark Board refused to buy the building. Goldman argues that, from that point forward, Prudential, being aware of the economic consequences of full disclosure, set upon a course of concealing any information concerning asbestos from prospective purchasers. Prudential contended that any prior knowledge of asbestos was acquired by the corporate headquarters and not the real estate sales division. Prudential officials testified that asbestos information was not shared among the various divisions.

In the spring of 1984, Goldman and Prudential entered negotiations concerning the possible sale of the Jefferson Building. Goldman's employees and experts conducted investigations and attempted careful inspection of the building. In March of 1984, before execution of the contract, Mr. Tim Don Kirk, a maintenance supervisor for Goldman, met with Prudential's on-site manager, Ms. Donna Buchanan, to inspect the building. During the course of his inspection, Mr. Kirk asked Ms. Buchanan if the building "had any defects or problems." Ms. Buchanan represented to Mr. Kirk that the building had no defects and that it only had one problem—a concrete floor in the mechanical room, which had been corrected. Mr. Kirk also asked Ms. Buchanan for the drawings, plans and specifications for the building; however, she told him that Prudential had only tenant as-built drawings, that no other plans or specifications were available. Goldman contended at trial that Prudential purposely and intentionally withheld the building plans and specifications. He contended that those plans and specifications listed a fireproofing material with the trade name MonoKote, a product which sometimes contained asbestos.[4] Prudential, on the other

---

**3.** Significantly, Mr. Rebholz was also the person at corporate headquarters in charge of the sale of the Jefferson Building in May of 1984.

**4.** Evidence was admitted at trial that Prudential, in an unrelated lawsuit, had sued W.R. Grace and Company, the manufacturer of MonoKote, which was the trademark for an asbestos-containing fireproof material. The admissibility of this evidence forms the basis of a separate point of error.

hand, denied having purposely withheld the plans and specifications. Furthermore, it claimed that an architect or engineer could not determine whether the MonoKote used in the Jefferson Building contained asbestos, since MonoKote was manufactured and sold both with and without asbestos.

Goldman introduced additional evidence to show that, before the sale of the Jefferson Building, Prudential had developed a sophisticated concealment strategy to prevent prospective buyers from discovering asbestos in its buildings. He introduced evidence that a prospective buyer on routine inspection would not be able to determine by visual examination whether asbestos materials were present. Prudential's Corporate Vice President, Mr. Rebholz, conceded that by 1983 he knew that the presence of asbestos had an adverse affect on the marketability of buildings and was therefore a "subject of extreme importance" to Prudential. Prudential's Corporate Vice President and Senior Portfolio Manager, Mr. Charles Lightner, knew that asbestos removal was expensive and that appropriate appraisal practice and policy required discounting a building to reflect removal costs. In his own words, asbestos had a "significantly detrimental effect on the value of a property." Although several Prudential officers acknowledged Prudential's obligation to disclose asbestos to potential buyers, Mr. Rebholz, the officer in charge of selling the Jefferson Building, testified that other Prudential executives maintained that it was unnecessary to disclose the presence of asbestos to prospective buyers.

One example, Goldman contended, of this concealment strategy involved the General Services Administration of the United States Government (GSA). When GSA submitted an asbestos-survey questionnaire to Prudential's corporate headquarters, Prudential responded with a memorandum to all of its leasing and management staff which mandated that "all members of the staff and our contract managers should be instructed *not* to complete this form." In addition, when Prudential circulated confidential articles concerning public health hazards related to asbestos in buildings constructed between 1950 and 1972, personnel at corporate headquarters were asked "not to circulate this outside of Prudential." Finally, a policy proposal for disclosure of the existence of asbestos with respect to any properties being sold by Prudential, suggested by a Prudential officer, did not make it through committee. The chief lawyer for Prudential's real-estate department redrafted this policy memorandum to delete any reference to asbestos.[5]

Based upon the foregoing testimony, the jury answered in favor of Goldman and against Prudential on the single liability issue submitted to it. The wrongful conduct of Prudential as found in this special issue was premised primarily upon two tort theories, DTPA misrepresentations and fraudulent concealment.

### B. *Prudential's Affirmative Misrepresentations*

■ Prior to the execution of the sales contract involving the Jefferson Building, Prudential's on-site manager, Ms. Buchanan, with Prudential's express authorization, made several representations to Goldman's representative, Mr. Kirk. Specifically, in response to his inquiry she represented that the building had "no defects" and that it had only "one problem," the concrete floor in the mechanical room. In addition, she represented to Goldman that the Jefferson Building was "one of the finest little properties in the City of Austin" and was a "superb, super fine building." Goldman argued at trial that these representations were false and the jury agreed. Prudential takes the position that these representations were no more than "puff talk" and cannot form a legal basis for a judgment in favor of Goldman.

In *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980), the Texas Supreme Court held that similar representations with respect to a boat in "excellent" or

---

**5.** This policy memorandum was an especially damaging piece of evidence to Prudential since it indicated that any reference to asbestos was deleted intentionally.

"perfect" condition were actionable misrepresentations under the DTPA. Similarly, in *HOW Insurance Co. v. Patriot Financial Services, Inc.*, 786 S.W.2d 533, 543–544 (Tex.App.1990, no writ), this Court held that the use of the term "meticulous construction" denoted a high degree of quality such as "excellent" or "perfect," and such use, if inaccurate, was actionable under statutory or common-law fraud theories even though the description was general in nature. Although general or broad statements can be actionable, the more imprecise or vague a statement the more likely it constitutes opinion as opposed to a factual misrepresentation. For example, in *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex.App.1990, writ ref'd), the Dallas Court of Appeals held that a car salesman's statement that a Mercedes was the "best engineered car in the world" did not qualify as an actionable misrepresentation of the car's characteristics or qualities. It appears to us that although these representations, standing alone, might be insufficient to sustain a cause of action, viewed under the totality of the circumstances and evidence, they are legally sufficient to support the general-charge single issue inquiring as to Prudential's wrongful conduct. Further, as we discuss below, additional evidence supports the jury's finding of liability.

## C. *Fraudulent Concealment*

Goldman contends that Prudential's affirmative misrepresentations led directly to the nondisclosure and fraudulent concealment of the asbestos problem in the Jefferson Building. Prudential responds that there is no direct testimony in this record showing Prudential had actual knowledge of the asbestos material in the Jefferson Building. While conceding a lack of direct evidence of Prudential's actual knowledge, Goldman contends that there is abundant circumstantial evidence in this record from which the jury could impute such knowledge to Prudential. Goldman argues that the most significant piece of evidence in this regard is the misrepresentation by Prudential's agent that Prudential did not have the plans and specifications for the Jefferson Building. Goldman

points to testimony in the record that this representation, made to his representative, was false and that Prudential had the plans and specifications on-site for a lengthy period of time. Prudential characterizes the failure to deliver the plans and specifications as an innocent mistake without any intent to deceive. Goldman, on the other hand, takes the position that Prudential intentionally concealed the plans and specifications because they were the *key* to detecting the use of MonoKote and thus the possible presence of asbestos in the Jefferson Building. "The jury is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given their testimony." *Dyson v. The Olin Corp.*, 692 S.W.2d 456, 458 (Tex.1985) (quoting *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (1951)). Apparently, the jury resolved much of the disputed testimony in Goldman's favor. We may not substitute our judgment for that of the jury. *Benoit*, 239 S.W.2d at 796.

Goldman introduced a significant quantum of circumstantial evidence to establish Prudential's course of conduct in failing to disclose information concerning asbestos in its properties when possible. This evidence included corporate memoranda and policy decisions, at the highest levels, affirmatively sanctioning the concealment of the presence of asbestos in any of Prudential's commercial properties. Prudential rebuts much of this testimony by denying any link between what obviously was an "asbestos cover-up" by Prudential's corporate home office and the subsequent sale of the Jefferson Building by Prudential's real estate division. In reviewing circumstantial evidence, we set forth the following guidelines:

> Any disputed fact may be established by circumstantial as well as by direct evidence. In neither case is the burden of proof greater than the preponderance. This rule does not require the quality of absolute certainty, nor does it require the plaintiff to exclude every other possibility. All that is required of such rule is that the circumstances point to the ultimate fact sought to be established with

that degree of certainty as to make the conclusion reasonably probable.

*McMillen Feeds, Inc. v. Harlow,* 405 S.W.2d 123, 130 (Tex.Civ.App.1966, writ ref'd n.r.e.).

Certainly, the evidence in this record was sharply contested and both parties vigorously presented their viewpoints. It is obvious from the verdict that the jury simply did not agree with Prudential's presentation and resolved much of the conflicting evidence and testimony in Goldman's favor. This is the jury's role and function. After reviewing the entire record, we conclude that the evidence was both legally and factually sufficient to sustain the jury's answer to Question No. 1, that Prudential had engaged in wrongful conduct.

### D. *The "As Is" Contract*

■ Prudential argues that even if it had a duty to disclose the asbestos in the Jefferson Building, that duty was contractually eliminated under the "as is" clause of the purchase-and-sale agreement with Goldman.[6] We disagree. The presence of actionable fraud or a violation of the DTPA creates liability in tort irrespective of contractual disclaimers. *See, e.g., Weitzel v. Barnes,* 691 S.W.2d 598, 600 (Tex.1985); *Cockburn v. Mercantile Petroleum, Inc.,* 296 S.W.2d 316, 326 (Tex.Civ.App.1956, no writ). On this very question, the *Cockburn* court held that an "as is" agreement does not defeat an action for fraud. *Id.* at 326.

More recently, in *Weitzel,* the Texas Supreme Court addressed a similar issue under a DTPA cause of action. As in this case, the seller in *Weitzel* argued that to allow liability under such circumstances would "do violence to all written contracts which provide that the purchaser takes 'as is.'" *Id.* at 599. After noting that silence could amount to a misrepresentation in certain situations, the supreme court held:

> In this instance, [the seller] affirmatively represented that the systems had quali-

ties which they did not actually possess. Even under a contract allowing inspection, an affirmative misrepresentation is actionable under the DTPA.

*Id.* at 601. Thus, we hold that the "as is" clause in the contract between Prudential and Goldman does not preclude, as a matter of law, Goldman's tort actions for fraud and violations of the DTPA. We overrule Prudential's points of error one and two.

### Admission of Prior Lawsuit

■ Plaintiffs' trial exhibit 102 was a copy of a first amended complaint filed by Prudential in a separate unrelated lawsuit against certain manufacturers of the identical asbestos-containing materials found in the Jefferson Building. The trial court admitted the exhibit. Goldman maintains that the pleading was admissible because it contained statements that were inconsistent with various positions taken by Prudential in the instant lawsuit. Prudential, in point of error three, disputes the admissibility of this exhibit.

■ Prudential has waived this point of error. A review of the record reveals that the exhibit was introduced without objection. In order to preserve the right to complain on appeal about the admission of evidence, Prudential was required to object at the time the prior-lawsuit pleading was offered. *Pope v. Darcey,* 667 S.W.2d 270, 273 (Tex.App.1984, writ ref'd n.r.e.). The objection needs to be specific enough to enable the trial court to understand the precise nature of the objection. *Texas Mun. Power Agency v. Berger,* 600 S.W.2d 850, 854 (Tex.Civ.App.1980, no writ). Prudential was next required to obtain a ruling on its objection. *MBank Dallas N.A. v. Sunbelt Mfg., Inc.,* 710 S.W.2d 633, 638 (Tex.App.1986, writ ref'd n.r.e.); *Huckaby v. Henderson,* 635 S.W.2d 129, 131 (Tex. App.1981, writ ref'd n.r.e.); *see also* Tex. R.Civ.Evid.Ann. 103(a) (Pamph.1992). Having failed to take any of these steps, Prudential has not preserved error.

---

6. The sale of property on an "as is" basis is a long-standing practice that Texas courts have recognized and enforced. *See, e.g., Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.,* 572 S.W.2d 308 (Tex.1978); *Singleton v. LaCoure,* 712 S.W.2d 757 (Tex.App.1986, writ ref'd n.r.e.); *Henderson v. Ford Motor Co.,* 547 S.W.2d 663 (Tex.Civ.App.1977, no writ).

However, even if the point were properly preserved, no error is presented. The general rule *governing the admission of pleadings from other actions* is succinctly stated in *St. Paul Fire & Marine Insurance Co. v. Murphree*, 163 Tex. 534, 357 S.W.2d 744, 747 (1962): "Pleadings *in other actions* which contain statements inconsistent with the party's present position are receivable as admissions."

The test for the appellate court to review the admission or exclusion of evidence by the trial court is abuse of discretion. "The trial judge has broad discretion in determining issues concerning the general admissibility of evidence." *Thompson v. Mayes*, 707 S.W.2d 951, 956 (Tex.App.1986, writ ref'd n.r.e.); *see also* Tex.R.Civ.Evid. Ann. 104(a) (Pamph.1992).

█ Goldman sought to introduce the evidence of the prior lawsuit to impeach two positions taken by Prudential at the time of trial: (1) Prudential took the position that the presence of asbestos in the Jefferson Building was not a problem, and that Goldman had not suffered any damages as a result of the presence of asbestos; (2) Prudential took the position that it had "no knowledge" about MonoKote which was manufactured by W.R. Grace and Company, the defendant in the other lawsuit.

Goldman contends that Prudential's position in the prior lawsuit is contradictory to its position in the instant case. We agree. Specifically, in the prior lawsuit, Prudential stated:

> The use of [Prudential's] buildings ... has been materially impaired due to the presence of the asbestos-containing materials of Defendants in the buildings, both through a diminution of market value and physical property damage to the buildings.

Additionally, in the instant lawsuit, Prudential's answers to requests for admissions suggested that they had no knowledge of MonoKote. By way of contrast, the pleadings contained in plaintiffs' exhibit 102 include great detail about asbestos-containing MonoKote manufactured by W.R. Grace and Company.

Goldman contends, therefore, that he was entitled to introduce Prudential's prior pleadings to show these inconsistencies. In addition to the fact that Prudential voiced no objection to the admission of the pleading, we also note that Prudential did not ask for any type of limiting instruction. We conclude that the trial court did not abuse its discretion in admitting Prudential's prior lawsuit as an exhibit. *See Sell v. C.B. Smith Volkswagen, Inc.*, 611 S.W.2d 897, 901 (Tex.App.1981, writ ref'd n.r.e.). Prudential's third point of error is overruled.

### Actual Damages

█ In its fourth point of error, Prudential claims that the evidence is factually insufficient to support the jury's finding regarding Goldman's actual damages. At trial, Goldman presented evidence of actual damages which included the testimony of an appraisal expert witness, Rudy Robinson. Mr. Robinson, testified that the presence of asbestos in the Jefferson Building diminished its market value on May 10, 1984, by over six million dollars. In arriving at his opinions, Mr. Robinson examined sales of comparable buildings by Prudential, including the Executive Plaza Building in Houston, Texas. He reviewed the substantial discounts in sale prices due to asbestos in those buildings. In addition, under the cost approach for removal of the asbestos from the Jefferson Building, Robinson estimated the actual economic damages at $6,574,783.00. The jury awarded $6,023,993.03 as actual damages.

Although Prudential did not call a single witness to testify on the issue of actual damages, many of the witnesses from Prudential's corporate headquarters confirmed that asbestos abatement was expensive and that appropriate appraisal practices and policy would be to discount the value of commercial buildings to reflect such cost.

Prudential contends that Goldman's recovery should be limited to $60,999.03, his out-of-pocket expenses. Upon discovery of the asbestos fireproofing in the building, *Goldman retained Maxim Engineers*, an asbestos consulting firm, to inspect the Jef-

ferson Building, to advise Goldman of the nature and condition of the asbestos fireproofing, and to recommend and implement any prudent remedial measures. Following inspection, Maxim advised Goldman that the asbestos did not pose a health risk and that the fireproofing was in very good condition. However, Maxim recommended the adoption of an operations and maintenance program, the total cost of which was $60,999.03 at the time of trial. Prudential contends that this amount should be the upper limit of Goldman's actual damages. We disagree.

■ The evidence at trial conclusively established that the discovery of asbestos-containing materials within the building substantially diminished the market value of the Jefferson Building. Much of this evidence came from Prudential's own officers who had substantial experience with the economic impact of asbestos in its commercial properties. This testimony regarding the depreciation of the Jefferson Building was sufficient to sustain the jury's award of actual damages. In addition, Goldman introduced evidence on the cost of asbestos removal. Prudential attacks this approach on the basis that the asbestos removal was never performed. We believe the case law is clear: where property has sustained damage which diminishes its fair market value, the cost of repairing or restoring the property to its full market value is an appropriate element of damage, irrespective of whether the repairs are actually performed. *See Ortiz v. Flintkote Co.*, 761 S.W.2d 531, 536 (Tex.App.1988, writ denied); *Greene v. Bearden Enters., Inc.*, 598 S.W.2d 649, 653 (Tex.Civ.App. 1980, writ ref'd n.r.e.). As the Texas Supreme Court observed in *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex.1984):

> Texas courts have recognized two measures of damages for misrepresentation. Texas common law allows an injured party to recover the actual injury suffered measured by "the difference between the value of that which he has parted with, and the value of that which he has received." *George v. Hesse*, 100 Tex. 44, 93 S.W. 107 (1906). This measure of

damages is known as the "out of pocket" measure and is calculated as of the time of sale. W. Prosser, *Handbook of the Law of Torts*, § 110 (4th ed. 1971). The second remedy available in Texas, known as the "benefit of the bargain" measure, allows the plaintiff to recover the difference between the value as represented and the actual value received. *Johnson v. Willis*, 596 S.W.2d 256, 262 (Tex.Civ. App.—Waco), *writ ref'd n.r.e. per curiam*, 603 S.W.2d 828 (Tex.1980). The DTPA permits a plaintiff to recover under either the "out of pocket" rule or the "benefit of the bargain" rule, whichever gives the consumer the greater recovery. *Id.* at 263.

Based on the theories of actionable fraud and DTPA violations, we hold that there is factually sufficient evidence to support the jury verdict on actual damages. Accordingly, Prudential's point of error number four is overruled.

### Exemplary Damages

In its fifth and sixth points of error, Prudential contends that: (1) exemplary damages are not recoverable as a matter of law; (2) there is legally and factually insufficient evidence to support an award of exemplary damages; and, (3) the award of exemplary damages violated Prudential's right to due process under the United States Constitution and the Texas Constitution.

#### A. *Right to Exemplary Damages*

■ Prudential argues that this case is not appropriate for the recovery of exemplary damages and that Goldman's judgment for such damages fails as a matter of law. Prudential relies primarily on the Texas Supreme Court decision in *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex.1986), and its progeny.

*Jim Walter Homes* involved a dispute over the sale and construction of a house. The jury found that Jim Walter Homes had breached the warranty of good workmanship in the contract and was grossly negligent in supervising the construction of the

house. The jury found actual damages, additional damages under the DTPA, exemplary damages, and attorney's fees. *Jim Walter Homes*, 711 S.W.2d at 617. The Texas Supreme Court reversed the award of exemplary damages. *Id.* at 618. In *Jim Walter Homes*, the plaintiff had pleaded both breach of contract *and* tort causes of action. *Id.* at 617. The negligence and DTPA claims arose during the *performance* of the contract. The case was submitted on *both* contract and tort theories. The actual damages found by the jury were clearly contract damages. On appeal to the Texas Supreme Court, that court held that the plaintiffs had not met their burden of establishing actual damages arising from a separate tort, independent of the breach of contract cause of action. Therefore, the court reasoned that a jury award for exemplary damages could not be upheld in the absence of an independent tort, with actual damages flowing therefrom. *Id.* at 618.

We believe that *Jim Walter Homes* is distinguishable and does not control the disposition of this case. In the instant case, Goldman sought recovery exclusively in tort and did not plead any allegations involving breach of contract. More importantly, the tort causes of action, i.e., fraudulent concealment and violations of the DTPA, all involved conduct predating the consummation of a contract. Indeed, Goldman's entire tort theory was premised upon Prudential's concealment and misrepresentations which *induced* him to enter into a binding contract. Thus, this case is distinguishable in that it is based entirely upon tort theories predating the entry of the binding contract between the parties and is not primarily a breach-of-contract case that incidentally *contains* a tort cause of action.

We also note that the damages awarded by the jury are actual damages for fraud and not contract damages. *See Leyendecker & Assocs.*, 683 S.W.2d 369; *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex.1983). As the Texas Supreme Court stated in *American National Petroleum Co. v. Transcontinental Gas Pipeline Corp.*, 798 S.W.2d 274, 278 (Tex.1990):

> In a commercial relations tort, the fact that the damages are "economic" does not mean that they may not be damages for the tort. The basic measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with, to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed.

We therefore conclude that Goldman, by his pleading, proof, and jury findings established his *right* to recover exemplary damages.

### B. *Evidence Supporting Exemplary Damages*

■■■ We now turn to a consideration of whether the evidence was legally and factually sufficient to sustain the jury finding supporting an award of damages. In Question No. 3, the jury found that Prudential's wrongful conduct was committed: (a) with conscious indifference to the rights of plaintiffs; (b) with gross negligence; and (c) with actual awareness that such conduct was wrongful. Prudential argues that the evidence in the record is insufficient to sustain jury findings in Question 3(a), (b), and (c). We disagree. We have already detailed the evidence in the record regarding Prudential's "cover-up" on the issue of asbestos contamination. Several Prudential officials testified that they felt no obligation to share their knowledge regarding the dangers of asbestos with other Prudential personnel, much less with the potential buyers of asbestos-contaminated commercial properties. The jury could have concluded that such conduct was either consciously indifferent to the rights of Goldman or constituted gross negligence. We conclude there was ample testimony to support the jury finding to Question 3(a), (b) and (c).

### C. *Due Process*

■■■ Prudential contends that the award of exemplary damages violated its right to due process under the United States Con-

stitution and under the Texas Constitution.[7] We reject this argument.

While this appeal was pending, the United States Supreme Court handed down its landmark decision in *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). In *Haslip*, the Supreme Court, in a seven-to-one majority opinion authored by Justice Blackmun, held that exemplary damages did not violate the due process clause of the Fourteenth Amendment.[8] The Court stated that the traditional, common-law approach allowing a jury discretion over the appropriateness and amount of the exemplary damage award based on the gravity of the wrong and the need to deter similar conduct, was not so inherently unfair as to deny due process. —— U.S. at ——, 111 S.Ct. at 1043, 113 L.Ed.2d at 19. In arriving at this conclusion, the Court considered the fact that jury discretion in awarding exemplary damages was deeply rooted in the history of Anglo–American jurisprudence. Further, the Court relied heavily upon the checks-and-balances provided by review of exemplary damage awards, first by the trial court and then by the appellate courts. —— U.S. at ——, 111 S.Ct. at 1046, 113 L.Ed.2d at 23. We conclude that *Haslip* is controlling in determining that the jury's award of damages does not violate the federal due process clause.

■ We also conclude that the exemplary-damage award in this case does not violate the Texas Constitution. While we recognize that the Texas Constitution may well provide broader rights and protections than its federal counterpart, many of the judicial safeguards relied upon in *Haslip* are applicable to a state constitutional due process analysis. For example, the opportunity for review by a trial court was available. Indeed, one of Prudential's points of error concerns the fact that the trial court did not grant a remittitur. Appellate review is also available. However, the jury award in the present case, which is less than two and one-half times the actual damages, does not offend traditional notions of due-process fairness.[9] We conclude that adequate procedural safeguards are provided to satisfy both federal and state constitutional due process concerns.

We find persuasive the holding of the court in *Lawson–Avila Construction Co. v. Stoutamire*, 791 S.W.2d 584, 593 (Tex. App.1990, writ denied), rejecting an attack on exemplary damages as violating state constitutional due process:

> We hold that the gross negligence standards upon which Texas allows exemplary damages is not vague and amply satisfies the due process safeguards guaranteed by the federal and state constitutions. *See Victoria Bank & Trust Co. v. Brady*, 779 S.W.2d 893, 913 (Tex. App.—Corpus Christi 1989, no writ). This is particularly true where we find, as we do below, that the award of exemplary damages was not excessive or unreasonable. *See Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 273, 109 S. Ct. 2909, 2920, 106 L.Ed.2d 219 (1989) (Brennan, J., concurring).

*See also Celotex Corp. v. Tate*, 797 S.W.2d 197, 208 (Tex.App.1990, no writ) (exemplary damages do not offend state constitutional due-process or excessive-fines clauses). Prudential's fifth and sixth points of error are overruled.

---

7. We note that the language used in art. 1, § 19 of the Texas Constitution is "due course of law" rather than "due process of law." However, the two phrases can be used interchangeably. *See generally* James Harrington, *Our Texas Bill of Rights* 13–14 (1991).

8. In *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), and *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), the Supreme Court upheld exemplary-damage awards subjected to constitutional challenge. However, in those cases, they specifically reserved the question of whether such awards would violate the due process clause.

9. Although inapplicable to the present case, we note that the Legislature has provided for a mandatory cap on exemplary damages of four times the actual damages or $200,000, whichever is greater. *See* Tex.Civ.Prac. & Rem.Code Ann. § 41.007 (Supp.1992). This legislative provision places an absolute limit on the jury's discretion to award exemplary damages in appropriate cases.

## Remittitur

In its seventh point of error, Prudential contends that both the actual and punitive damages awarded by the jury are excessive and complains of the trial court's failure to grant a remittitur.

The standard of review for suggestions of remittitur or claims of excessive damages is succinctly set forth in *Pope v. Moore:* "Factual sufficiency is the sole remittitur standard for actual damages. In determining whether damages are excessive, trial courts and courts of appeal should employ the same test as for any factual insufficiency question." 711 S.W.2d 622, 624 (Tex.1986) (citations omitted).

### A. *Actual Damages*

■ In the instant case, Goldman's evidence established damages up to $6,500,-000. Prudential called no witnesses on damages, relying instead on cross-examination of Goldman's witnesses. The problem in reviewing excessiveness claims when the damage testimony is largely undisputed is discussed in *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 861 (Tex.App.1987, writ ref'd n.r.e.), *cert. denied,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988), which summarized the problems as follows:

> Texaco presented no expert testimony to refute the claims but relied on its cross-examination of Pennzoil's experts to attempt to show that the damages model used by the jury was flawed. Dr. Barrow testified that each of his three models would constitute an accepted method of proving Pennzoil's damages. It is inevitable that there will be some degree of inexactness when an expert is attempting to make an educated estimate of the damages in a case such as this one. Prices and costs vary, depending on the locale and the type of crude found. The law recognizes that a plaintiff may not be able to prove its damages to a certainty. But this uncertainty is tolerated when the difficulty in calculating damages is attributable to the defendant's conduct.

In *Flanigan v. Carswell,* 329 S.W.2d 902, 903 (Tex.Civ.App.1959, writ ref'd n.r.e.), this Court reached a similar conclusion in upholding a jury's damage award and pointedly noted that "appellants offered no rebutting medical testimony." From a complete review of the actual damage testimony in this record, we conclude that the trial court did not err in refusing to grant a remittitur. We conclude there is ample evidence from which the jury could arrive at actual damages of $6,023,993.03.

### B. *Exemplary Damages*

■ In *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981), the supreme court identified the following factors to assess whether a punitive damages award is excessive:

1. the nature of the wrong;
2. the character of the conduct involved;
3. the degree of culpability of the wrongdoer;
4. the situation and sensibilities of the parties concerned; and
5. the extent to which such conduct offends a public sense of justice and propriety.

616 S.W.2d at 910. Each of these factors must be assessed in light of the facts and circumstances of the particular case. *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810, 818–19 (Tex.App.1988, no writ).

In addition, the ratio between the actual and exemplary damages should be evaluated for reasonableness. While it has been stated many times that no absolute ratio exists to test the reasonableness of an exemplary damage award, the 2.3:1 ratio of exemplary damages in this case falls well below the amounts allowed in other cases. *See, e.g., American Natural Petroleum Co.,* 798 S.W.2d at 281 (3.4:1 ratio; $4.7 million actual, $16 million punitive); *John Deere Co. v. May,* 773 S.W.2d 369, 377–78 (Tex.App.1989, writ denied) (3.5:1 ratio); *K-Mart Corp. Store # 7441 v. Trotti,* 677 S.W.2d 632, 639–640 (Tex.App.1984), *writ ref'd n.r.e.,* 686 S.W.2d 593 (Tex.1985) (12.-5:1 ratio); *Russell v. Truitt,* 554 S.W.2d 948, 955–56 (Tex.Civ.App.1977, writ ref'd

n.r.e.) (7:1 ratio). Based upon a review of all of the evidence in the record in view of the *Kraus* factors, as well as the reasonableness of the ratio of exemplary damages to actual damages, we conclude that the trial court did not err in failing to order a remittitur. Prudential's seventh point of error is overruled.

### Prejudgment Interest

In its eighth point of error, Prudential attacks the trial court judgment for awarding prejudgment interest on the actual damages. Prudential complains that although Goldman did not discover the presence of asbestos until 1986, the trial court permitted prejudgment interest from the date of the sale.

The general rule for when to commence prejudgment interest in a case such as the one at bar is summarized in *Smith v. National Resort Communities*, 585 S.W.2d 655, 660 (Tex.1979):

> This Court in *Watkins v. Junker*, 90 Tex. 584, 40 S.W. 11 (1897) laid down the rules that where the measure of recovery is fixed by the conditions existing at the time that the injury is inflicted, the person entitled to recover has also the right to have compensation for the detention of the money to which he is entitled by reason of the wrong done to him; that if interest be properly an element of damages in any case, then it is so as a matter of law....

In the instant case, Goldman's expert witness established damages in excess of $6,500,000 as of the date of the sale of the Jefferson Building on May 10, 1984. Further, Goldman sustained his actual damages as soon as he purchased the Jefferson Building because of the presence of asbestos. We believe that the ruling in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), supports the proposition that the plaintiff is entitled to recover prejudgment interest on the actual damages from the date sustained until the date of the judgment.

One reason for this rule is that "[p]rejudgment interest compensates a [plaintiff] for lost opportunities to invest and earn interest on the amount of damages between the time of the occurrence and the time of judgment." *Kilgore Junior College Dist. v. Kettle Restaurants*, 768 S.W.2d 775, 776 (Tex.App.1989, writ denied). This rule is also applicable to tort cases involving fraud. *Neeley v. Bankers Trust Co.*, 757 F.2d 621, 633 (5th Cir.1985).

In the instant case, although the asbestos was discovered at a later time, Goldman's damages actually accrued on the date of the sale and therefore it was appropriate for the district court to allow prejudgment interest from the date of the injury and sale, as opposed to the date of actual discovery of the asbestos.

Finding no error in the award of prejudgment interest by the district court, we overrule Prudential's eighth point of error.

### Attorney's Fees

In its ninth and last point of error, Prudential argues that the award of attorney's fees permitted Goldman to make a double recovery. Prudential complains that Goldman's attorney, in final argument, mentioned attorney's fees as an element of general damages. Then, on final judgment, the trial court included the stipulated attorney's fees as an additional item of damage. We note first that the parties stipulated to the amount of the attorney's fees in the record. We also note that attorney's fees were stipulated prior to the submission of the case to the jury. Tex.R.Civ. P.Ann. 11 (Supp.1992). Attorney's fees are appropriately recoverable under the DTPA. Tex.Bus. & Com.Code Ann. § 17.50 (1987). The jury question regarding actual damages, to which Prudential did not object, does not mention attorney's fees. Because it failed to object to the damage issue as submitted, Prudential waived any alleged error that attorney's fees should have been expressly excluded from the damage submission. Tex.R.Civ.P.Ann. 272 (Supp. 1992); *see Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134, 137 (Tex.1987); *Matthews v. Candlewood Builders*, 685 S.W.2d 649, 650 (Tex.1985). Prudential also failed to request an instruction in the charge that attorney's fees constituted a double recovery

and so waived that objection. Tex.R.Civ. P.Ann. 273 (Supp.1992). Finally Prudential waived any objection to attorney's fees being mentioned on closing argument by failing to object to such reference. *Shenandoah Ass'n v. J & K Properties,* 741 S.W.2d 470, 486 (Tex.App.1987, writ denied). Therefore, based upon this record, it appears that Prudential waived any complaint that it might have had regarding a potential double recovery due to the trial court's award of attorney's fees. Prudential's ninth point of error is overruled.

### CONCLUSION

Finding no error, the judgment of the district court is affirmed.